STROBRIDGE LITHOGRAPHING CO. v. RANDALL.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1896.)

No. 318.

CONTRACTS—ASSENT—NEGOTIATIONS.

The S. Co. was a creditor of the firm of B. & D., and had commenced an action against the members of the existing firm, together with one R., who had recently retired from it, and who alone had been served in the action. Pending this action, negotiations were begun between the S. Co. and B. & D. for a settlement of the S. Co.'s claims, in the course of which an arrangement was made by which it was thought that, if B. & D. could

get certain notes of their own, held by R., they could raise money to effect a settlement. Thereupon S., the president of the S. Co., telegraphed from New York to R., in Michigan: "Will you turn over to us the notes amounting to $4,000 you hold of B. & D? If so, will release the parties to the suit against B. & D., and they will get you released from all other indebtedness of the firm;" to which R. replied: "Certainly. * * * Will get them, and turn them over to you on condition of your telegram." The settlement was never in fact made. *Held*, that such telegrams were merely intended by the parties as negotiations for an agreement, and did not constitute a completed contract by S. or the S. Co. and R., by which the latter was released from his obligations, as a member of the firm of B. & D., to the S. Co.

Error to the Circuit Court of the United States for the Eastern District of Michigan.

The Strobridge Lithographing Company is a corporation of Ohio, with its place of business in Cincinnati, and is engaged in printing lithograph advertisements for theatrical companies. Prior to July 1, 1884, Joseph Brooks and James Dickson, of New York, constituted a partnership known as Brooks & Dickson, whose business it was to organize and manage various traveling theatrical companies. James A. Randall is a lawyer, living in Detroit, Mich., who, upon July 1, 1884, became associated as a partner in the firm of Brooks & Dickson. Prior to Randall's entering the firm, Brooks & Dickson had incurred an indebtedness to the Strobridge Company of about $9,000 for printed stock, for which they had given notes, 14 in number, maturing at different dates. The new articles of co-partnership between Brooks, Dickson, and Randall provided that Randall should not assume or in any wise become responsible for any debts or obligations of the late firm of Brooks & Dickson, except such obligations as arose from contracts made for the business of the season of 1884–85, which had not then in anywise been performed. Randall withdrew from the new firm in December, 1884, and early in 1885 Brooks & Dickson became insolvent. An action was begun by the Strobridge Lithographing Company in the Wayne circuit court at Detroit, Mich., against Randall, Brooks, and Dickson, Randall being the only one served, to recover a judgment upon the indebtedness of both the old and the new firms, the contention being that by negotiations and extensions of time on the old indebtedness subsequent to the formation of the new firm it had become liable therefor. The case was heard at length before a jury, and resulted in a verdict against Randall in favor of the company for about $1,800. An appeal was taken by both parties to the supreme court of Michigan, and upon a hearing by that court the judgment of the court below was reversed. The supreme court held that the court below should have directed a verdict for the defendant on the ground that by a binding contract Randall had been released by the Strobridge Lithographing Company from all the indebtedness it was then seeking to enforce. The cause was remanded accordingly to the Wayne circuit court, with directions to order a new trial. When the case reached the circuit court, the lithographing company dismissed it without prejudice, and began an action in the court below. The same defense of release was pleaded in this action, and it was upon this ground that the learned judge of the court below directed a verdict for the defendant. The record discloses the following in respect to the alleged release:

After Brooks & Dickson failed, in 1885, and the suit was brought in the Wayne circuit court, as above stated, against Randall, negotiations were begun between the lithographing company and Brooks & Dickson in New York for a settlement of the indebtedness. The matter was considered by the board of directors of the lithographing company, and at a meeting held July 24, 1885, they directed their president to send the following telegram to Brooks & Dickson:

"At a meeting of our board, just adjourned, I am instructed to notify you as our ultimatum that we will release you on payment of four thousand dollars cash; we retaining the stock on hand."

This telegram was sent. A few days thereafter, Hines Strobridge, the president of the company, stopped in New York on his way from Cincinnati

to Watch Hill, R. I., and had a conference with Brooks & Dickson. They told him that Randall had notes against them for $4,000; that if the lithographing company could obtain these notes from Randall, a friend of theirs, named Connor, would discount the notes, and thus furnish $4,000 with which they could pay the lithographing company the amount agreed upon as a composition of the whole indebtedness, and that, with this indebtedness provided for, they could settle with all their other creditors. Thereupon Strobridge sent Randall the following telegram:

"James A. Randall, Attorney at Law: Will you turn over to us the notes amounting to four thousand dollars you hold of Brooks & Dickson? If so, will release the parties to suit against Brooks & Dickson, and they will get you released from all other indebtedness of the firm. Answer quick.
"Hines Strobridge."

Randall answered:

"To Hines Strobridge, Strobridge Lithographing Co., New York City: Certainly. Notes have been assigned to Atkinson, but will get them, and turn them over to you on condition of your telegram. James A. Randall."

On August 6th, Strobridge, at Watch Hill, advised the board of directors of the lithographing company at Cincinnati that the proposition of Brooks & Dickson to pay or secure the payment of $4,000 could not be carried out by them, and referred the matter to the board of directors. On August 10th the board decided that the proposition to settle for $4,000 must be carried out, either in money or in secured notes. Randall testified that after he sent the telegram he immediately wrote to Strobridge to say that he had procured the Brooks & Dickson notes from Atkinson, and held them subject to his order, and that Strobridge replied to that letter. Strobridge denies having received such a letter, and says that Randall never offered to turn the notes over to him at all, but that the whole matter was broken off; that he met Randall in 1886, and that nothing was said about the notes, and that he had no idea that Randall claimed a right to tender them in settlement until March, 1887, when he delivered them to the clerk of the state court.

The evidence before the supreme court of Michigan was slightly different from that presented in this cause. Their opinion is reported under the name of Lithographing Co. against Randall, 78 Mich. 195, 44 N. W. 134.

Ramsey, Maxwell & Ramsey and Griffin & Warner, for plaintiff in error.

Alfred Russell, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge (after stating the facts as above). The first question that meets us in this case is whether the two telegrams between Strobridge and Randall made a contract of release. If they did not, then the judgment of the court below must be reversed, without regard to the other questions made here, of accord and satisfaction, and of Strobridge's authority to bind his company by the alleged contract of release. Mr. Justice Foster, of the supreme judicial court of Massachusetts, speaking for that court in Lyman v. Robinson, 14 Allen, 242, 254, said:

"A valid contract may doubtless be made by correspondence, but care should always be taken not to construe as an agreement letters which the parties intended only as a preliminary negotiation."

In Ridgway v. Wharton, 6 H. L. Cas. 238, Lord Wensleydale said:

"An agreement to be finally settled must comprise all the terms which the parties intend to introduce into the agreement. An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms."

In Rossiter v. Miller, 5 Ch. Div. 648, 659, Lord Justice James said:

"On a question of construction different minds may differ, but, for my own part, I have often felt that in cases of this nature parties have found themselves entrapped into contracts which they wrote without the slightest idea that they were contracting."

—And the same learned judge used similar language in Smith v. Webster, 3 Ch. Div. 56.

Whether correspondence with the purpose of entering into a contract is merely preliminary negotiation or the contract itself must be determined by the language used and the circumstances known to both parties under which the communications in writing were had. If it is plain from the language used that some term which either party desires to be in the contract is not included or definitively expressed in the correspondence relied upon, no contract is made. If it is plain from the language that either party wishes or contemplates that another person, not a party to the correspondence, shall be a party to the contract, a correspondence as to the terms of such a tripartite agreement between two cannot be a completed contract between the two. It is as' essential that all the parties intended shall be bound as it is that all the terms intended should be definitively agreed upon.

We may infer from the evidence in this case that Randall knew, when Strobridge's telegram was read by him, that Brooks & Dickson and the Strobridge Company were negotiating for a settlement of the indebtedness of the insolvent firm to the Strobridge Company, and that it would help matters if the Strobridge Company could become the owners of the notes held by Randall. The first sentence was a question. The next two sentences were the basis upon which it was desired that the question should be answered. If the telegram had read, "Will you turn over to us the notes amounting to four thousand dollars you hold of Brooks & Dickson? If so, will release you from the Detroit suit," and if it had been answered by an affirmative acceptance, undoubtedly this would have made a complete and binding contract between Randall and the Strobridge Company, assuming Strobridge's authority to make it. But Strobridge's telegram was more than this. He not only proposed to release Randall from the Detroit suit, but he added that Brooks & Dickson would get Randall released from all other debts of the firm. There is no evidence that Strobridge had any authority to bind Brooks & Dickson to such a contract with Randall, and there is nothing on the face of the telegram to indicate that he assumed to speak as agent for them in making such a contract. Nor, on the other hand, is there anything in the language used to indicate that Strobridge, for his company, intended to warrant that Brooks and Dickson would procure their other creditors to release Randall. Undoubtedly A. can make a contract with B. that C. shall do something, or, to bring it nearer to the case in hand, A. can make a contract with B. that C. shall procure D. to do something for B.'s benefit; but such contracts or covenants of warranty are not usual, and the intention should be clear before such a construction will be enforced. Strobridge does not here say, "We'll agree or warrant that Brooks & Dickson will secure a re-

lease of you by their creditors." He simply states in a positive way something which will happen. He is merely conveying information of a direct and reliable character to Randall, to enable him to say whether he will be a party to a tripartite agreement of settlement between the Strobridge Company and Randall and Brooks & Dickson. Strobridge's telegram was one of inquiry, to know whether the proposed settlement was possible. When answered, it was not a contract, because there was lacking the essential element of the presence as parties to it of the third persons whom Strobridge plainly intended should be the parties thereto of the third part.

The notes of Brooks & Dickson held by Randall were apparently a consideration quite inadequate for the release of Randall from the firm's entire indebtedness. Given to him in an adjustment of an indebtedness between members of the partnership, they would doubtless be postponed in the settlement of the insolvent firm's estate to all the other new firm debts incurred prior to his withdrawal from the firm. They were of no value whatever to the Strobridge Company unless Brooks & Dickson succeeded in procuring their discount. Randall might reasonably understand that the value of the notes to the Strobridge Company grew out of their place in the future agreement of settlement between Brooks & Dickson, the Strobridge Company, and himself, and that, but for such an agreement, they could have no real value. We are not to be understood as holding that the notes were not in a technical sense a valuable consideration sufficient to uphold a contract of the effect claimed for these telegrams, but we hold that the actual inadequacy of the consideration is a pregnant circumstance to show that the contract was not a complete one without the presence and agreement of Brooks & Dickson to insure to the Strobridge Company some value in the notes which were to be turned over. We do not consider the conduct of the parties subsequent to the telegrams, because there is a direct conflict of evidence in regard to it. We rest our construction of the telegrams on their language and the then situation of the parties.

The suggestion is made that as between Randall and Strobridge the contract is complete. There is the proposed surrender of the notes on one side and the proposed release from the Detroit suit on the other. Why cannot Randall waive the release from the other creditors? If there were a binding contract, undoubtedly Randall might enforce one of the considerations moving to him and waive the other, but the question here is not of waiver of a term of an admitted contract, but it is whether a complete contract was made. Now, there was no complete contract as between Randall and Strobridge unless Strobridge could enforce it against Randall. Could Strobridge sue Randall for a breach of a contract on a mere tender to Randall of a release from the Detroit suit? Clearly not, because Randall could say, "My telegram was sent on the basis of the statements in yours, and one of those was that Brooks & Dickson would procure my release from the other firm debts." This shows that the contract, if it was made, necessarily included as a term in it the release of Randall from the other firm debts. That statement in Strobridge's telegram cannot be rejected as part of the alleged con-

tract, either on the theory of Randall's present willingness to waive it, or on the ground that it was mere surplusage. We are bound to construe its effect in deciding whether both parties intended to make a complete contract, or were only engaged in preliminary negotiation. We have given above our reasons for holding that this was a mere statement of the term of a future contract to which Brooks & Dickson wou'l agree, rather than the statement of a condition or term of a contract which Randall was then invited to close finally by acceptance.

We reach in this case a conclusion different from that announced by the supreme court of Michigan in the same controversy. We regret it, because of the high respect we have for that tribunal. We should have differed from it with even more diffidence had that learned court considered the point upon which our decision rests. The completeness of the telegraphic correspondence as a contract seems to have had little consideration before it, but was assumed in the discussion.

The judgment of the circuit court is reversed, with directions to order a new trial.