## No. 12,003.

PIERCE, ET AL., *v.* MARLAND OIL COMPANY OF COLORADO.

Decided May 20, 1929. Rehearing denied June 10, 1929.

Mr. Benjamin Griffith, Mr. Archibald A. Lee, Mr. M. W. Spaulding, for plaintiffs in error.

Mr. George C. Manly, Mr. Everett E. Trout, for defendant in error.

*In Department.*

Mr. Justice Adams delivered the opinion of the court.

Pierce and McCall, plaintiffs below, ·brought action against Marland Oil Company of Colorado to recover damages for alleged breach of contract, to which several defenses were interposed, one of which was that there was no contract between the parties. The court held that although extensive negotiations had been carried on, nevertheless there was no completed contract. On this ground, defendant's motion for nonsuit was granted at the close of plaintiffs' testimony, and judgment against plaintiffs for dismissal of the action and for costs was accordingly entered. Pierce and McCall, the plaintiffs, will be referred to as vendors, and the Marland Oil Company, defendant, as the producer.

Ambrosia lake structure, in McKinley county, New Mexico, had, or was supposed to have had, valuable oil and gas potentialities of an undeveloped character. Vendors had exclusive leasehold interests in or about the place, and the producer, a large company engaged in the producing and marketing of oil and gas, also held leases on or interests in other lands there, among which was included the southwest quarter of section 13, township 15 north, range 10 west. Section 14, same township and range, referred to in the complaint hereafter mentioned, lies to the west of and immediately adjacent to section 13.

The contentions of the parties can best be told by excerpts from the pleadings. The vendors' complaint was filed on June 30, 1926. Plaintiffs allege, in effect, that on April 7, 1926, they were the owners of certain oil and gas

mining leases, dated February 9, 1925. One was from Ka-nus-wat, Indian Allottee No. 150, as lessor, to plaintiffs as lessees, and covered the northeast quarter of above section 14. The other was from Hot-tez-pah, Indian Allottee No. 151, as lessor, to plaintiffs as lessees, and covered the southeast quarter of the same section. Both leases were approved by the Secretary of the Interior of the United States. The complaint alleges that on July 10, 1925, the plaintiffs made and executed, and in December, 1925, delivered, an assignment of their interest in and to said leases to Orson L. Early, of Whittier, California, but that under the assignments plaintiffs reserved an overriding royalty of two per cent of all the oil and gas over and above the royalty to be paid to the United States government. The leases in evidence show the royalty reserved to the United States to be 12½ per cent, for the use and benefit of the Indians.

Complainants further allege that on April 7, 1926, they made and entered into a contract in writing with the producer, under the terms of which the latter offered and agreed to commence operations for the drilling of an oil and gas well to be located on the southwest quarter of the above mentioned section 13, for and in consideration of the relinquishment by vendors to producer of an overriding royalty in the east half of said section 14, then and there owned by vendors; that the offer was accepted by vendors and the contract made on April 7, 1926. That by the terms of the agreement it was specifically promised that producer would commence drilling operations, weather conditions permitting, on or before May 1, 1926; that vendors were at all times and are able, ready and willing to execute and deliver said relinquishment, and to perform the terms and conditions imposed on them, and that they attach to the complaint a relinquishment of the two per cent royalty; that weather conditions permitted; that vendors demanded performance, but that the producer has failed and refused and still fails and refuses to comply with the agreement.

The complaint also shows that vendors were the owners of other oil and gas leases and royalties, on lands specifically described, adjacent to or in the close neighborhood of said section 13, and that if defendant had commenced drilling operations and complied with its part of the contract, such royalty and leasehold interests of the plaintiffs, on May 1, 1926, would have been and still would be of the actual or market value of $16,360, but that by reason of the producer's failure as above, said leases and royalties were rendered wholly valueless, and still are of no market value whatsoever. Plaintiffs prayed judgment for the amount above named.

General and special demurrers to the complaint were overruled and the producer answered. It denied vendors' allegations, and alleged that negotiations between the parties were not consummated into a definite, certain and positive agreement, or any agreement at all; that the terms of the alleged agreement were subsequently altered and rescinded by further negotiations, and that the negotiations were always open, unexecuted and unconsummated; that there was no meeting of the parties' minds; that certain conditions precedent were not performed by vendors, in that they failed to relinquish, in due form, the overriding royalty of two per cent, which they were required to do before any drilling obligation by the producer ever existed or was created, and that the condition thereby failed. That Pierce, one of the vendors, represented that he owned such overriding royalty, but that on April 7, 1926, the two Indian leases were held by and vested in Orson L. Early, subject to the approval of the Secretary of the Interior, and were then subject to defeasance for failure to pay rentals as provided in the leases; that plaintiffs were not the owners of the said leases on April 7, or May 1, 1926, and that because of defects in title therein, the producer could not legally nor with security enter into such drilling operations; that vendors failed to correct the defects in title, and thereby precluded producer from complying with the purported

agreement or at all, and that the purported damage claimed is too general, speculative and remote to be actionable.

1. We have designedly treated the plaintiffs as vendors, because, by their own averments, they were to have conveyed a certain "overriding royalty" in an oil and gas mining lease to the producer, in consideration of which the latter, so the vendors claim, was to have commenced drilling on adjoining land.

■ Rents and royalties are profits issuing out of the land. When they are to accrue, they are a part of the estate remaining in the lessor. *United States v. Noble,* 237 U. S. 74, 80, 59 L. Ed. 844.

■ 2. Did the vendors prove the contract alleged to have been made? They sought to do so by letters and telegrams. We have held, and the rule is still extant, that a completed contract may be so evidenced. *Marti-Matter Co. v. Thomas,* 70 Colo. 478, 202 Pac. 703; *Carlsen v. Hay,* 69 Colo. 485, 195 Pac. 103; *Barrett v. Book Cliff R. R. Co.,* 70 Colo. 440, 201 Pac. 1026.

3. In the *Marti-Matter Co.* case, *supra,* we said at page 481 of the reported decision: "The correspondence shows a settled intent and purpose on the part of the defendants to abide by and carry out the agreement in manner and form as therein expressed. Indeed, the whole transaction was definitely and specifically set out in writing, and the correspondence establishes a completed agreement on the part of the defendants to sell and the plaintiff to buy. Plainly their minds had met on the terms and conditions of purchase and sale." In the instant case, however, the above elements are wanting. The *Barrett* case, *supra,* declares that it is not important that all the terms be set out in one instrument, if the intent to contract may be clearly inferred. And in *Carlsen v. Hay, supra,* we said that neither custom nor reason require minute details in proposals and acceptance. These statements, however, do not dispense with the necessity for the meeting of minds on essential conditions of the

contract. Warvelle on Vendors (2d Ed.), vol. 1, sections 100 and 101; *Gill Mfg. Co. v. Hurd,* 18 Fed. 673; *Mayer v. McCreery,* 9 N. Y. St. Rep. 114.

One of the points on which the minds of the parties did not meet was the settlement of rents accrued or about to accrue, on the Indian leases, which were subject to defeasance for failure of payment. Another most important disparity between the parties' minds is made manifest in the difference between the property interest which the vendors allege in their complaint the producer was to get, and that which the producer expected to acquire as a condition to drilling. It comes out in the letters and telegrams. One of the letters from Yingling, producer's representative, to Pierce, one of the vendors, indicated that the producer expected a lease from California parties (Early or some one else) on the east half of 14, but Yingling complained that the royalties were too high; that it would mean 16½ per cent, that is, 12½ to the Indians, two per cent overriding royalty to the California parties which they demanded, and another two per cent to vendors. The latter thereupon offered by wire to release or assign their two per cent to the producer. But this left the assignment of the California interests still to be obtained by the producer, and it has not been obtained. Vendors have ignored this in their complaint. The producer has met it by denial of the contract alleged to have been made. In other words, if there was a contract, it is a wholly different one from that pleaded. And it goes farther than only to the plea. If there was any agreement at all, it contains unperformed conditions precedent, that is, the correspondence indicates that producer expected a valid assignment of the leasehold in section 14, from other parties deraigning through vendors, with royalties not to exceed 14½ per cent in all, as a protection, it is said, of or from an off-set well in 14, in the event of successful production in 13. But whatever producer's reasons were, it had a right to exact the condition. The pro-

ducer acquired no interest in section 14, as far as the record shows.

4. Courts scrutinize closely correspondence and telegrams. We quote from Warvelle on Vendors (2d Ed.), section 100, at page 133: "In many instances such letters are intended merely as preliminary negotiation. Proposals are made and views exchanged; prices are discussed, and suggestions offered relative to the property under consideration. From all this a strict construction might possibly deduce a contract within the meaning of the statute of frauds, and yet such might not have been the actual intent of the parties. The question, therefore, in such cases always is: Did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they formally proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound? If upon this view it appears that the letters were merely the basis for a contract, or if it is reasonably doubtful whether what passed was only treaty, no action can be maintained on them. This is particularly true if the party attempting to enforce the contract has done nothing under it."

Counsel for the producer cite also among their authorities, the following: Taft, Circuit Judge, in *Strobridge Lith. Co. v. Vandall,* 73 Fed. 619, 19 C. C. A. 611, 43 U. S. App. 160; *Central, etc., Paving Co. v. Village of Highland Park,* 164 Mich. 223, 129 N. W. 46; *Elks v. North State Ins. Co.,* 159 N. C. 619, 75 S. E. 808; *Lyman v. Robinson,* 14 Allen (Mass.) 242, 254. They cite other authorities, but these are sufficient to illustrate the point. Whether or not the parties have completed their negotiations, or whether they designed that their agreement should be expressed in a formal written contract, is always dependent upon the circumstances of the particular case. *Wharton v. Stoutenburgh,* 35 N. J. Eq. 266. The correspondence and telegrams before us are voluminous, clearly indicating negotiations about a lease on

section 14, royalty interests, the amount thereof,. and drilling on section 13, and other matters not bearing on the issue, but in the particulars stated, they fail to make out that the minds of the parties met and determined upon any such contract as alleged. On the contrary, it appears that conditions precedent to the fulfillment of even their tentative discussions or proposed arrangements were not performed. This statement calls for a brief review of the Indian leases.

5. The Indians referred to are members of the Navajo tribe, over whom the federal government, as parens patriae, exercises a protectorate. The original leases from the Indians to vendors, approved by the Secretary of the Interior, recite that such leases are made under and in pursuance of the act of Congress approved March 3, 1909 (35 Stat. L. 781, 783), and the regulations approved by the Secretary of the Interior, September 3, 1912. The leases are expressly made subject to the regulations of the Secretary, and provide that upon violation of any of the substantial terms and conditions of the lease, he may, on certain notice, declare the lease null and void, and the lessor shall then be entitled to take immediate possession. The leases permit assignments thereof or any interest therein with the approval of the Secretary of the Interior, but regulations of the Department of the Interior forbid assignments without his approval.

■ Regulations of the Department of the Interior for the protection of Indians and their property, authorized by Congress and not inconsistent with law, have the force of law. *Blanset v. Cardin,* 261 Fed. 309, 312, citing: *In re Kellock,* 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813; *United States v. Foster,* 233 U. S. 515, 34 Sup. Ct. 666, 58 L. Ed. 1074; *United States v. Smull,* 236 U. S. 405, 35 Sup. Ct. 349, 59 L. Ed. 641; *McKinley v. United States,* 249 U. S. 397, 39 Sup. Ct. 324, 63 L. Ed. 668.

■ 6. There were several assignments, or attempted assignments of the Indian leases, subsequent to their

original acquirement by vendors, also of royalty interests, but none of them after the original grants bore the approval of the Secretary of the Interior. This fact is undisputed. Was it incumbent on vendors to get such approval in order to make their tender good as to an assignment to the producer of vendors' two per cent overriding royalty? We think it was. *Anicker v. Gunsburg*, 246 U. S. 110, 62 L. Ed. 603, relates to a contest between two conflicting claimants to leases on Indian lands. The Secretary had approved one lease and disapproved the other. The court says at page 120: "It does not appear that had he [the Secretary] disapproved the Gunsburg lease, he would have approved the one to appellant, and, until this affirmatively appears, appellant has no standing which permits a court by its decree to award the leasehold to him." See also *Parker v. Sinclair*, 25 Fed. (2d) 570, 574. In the instant case, the Secretary might have regarded any act of domain exercised by the producer over section 14 as that of a trespasser. In ordinary real estate transactions, proof of ownership may be proof of ability to convey, but obviously, vendors cannot speak for the Secretary, nor prophesy as to his actions. The validity of the assignments, when, if ever, they arrive on the desk of the Secretary of the Interior, will be passed on by him, and we have neither the power nor the desire to interfere. *Parker v. Sinclair, supra,* at page 574 of the opinion. The absence of the Secretary's approval destroys the certainty of vendors' *ability* to convey, as alleged, regardless of their willingness. They may or may not have been so able; it is wholly conjectural. The legal restraints on alienation and the Secretary's unexpressed thoughts overshadow this entire transaction.

 7. The regulations of the Department of the Interior also require assignments of Indian leases and stipulations modifying their terms to be filed with the officer in charge within 30 days after date of execution. No compliance was attempted. Somewhat analogous to

the case at bar is *Strauss v. Brier,* 57 Colo. 65, 140 Pac. 183, involving a patent right under §4898, R. S. U. S. An assignment of a patent for an invention, or interest therein, was required to be recorded in the patent office within three months from the date thereof. At page 71 of the opinion it is said: ''There can be no valid existing conveyance until it is recorded in the patent office. It is therefore the clear duty, and in this case a necessary prerequisite to the bringing of the suit, if the action might otherwise be maintained, that the plaintiff should have tendered such a conveyance. The defendant cannot be required to perform his part, and the plaintiff be permitted to perform or not, at his own will.'' We must hold similarly as to the requirements of the Department of the Interior concerning assignments of Indian leases and royalty interests.

■ 8. Counsel for vendors cite *Hertzel v. Weber,* 283 Fed. 921, an opinion by Judge Lewis of the eighth federal circuit, on the distinction between void and voidable Indian leases, unapproved by the Secretary of the Interior. The case involved the ownership of a third party's right to a specified per cent of oil and gas *produced.* The court wisely held that justice and equity would not permit a party, after notice, to stand by while another man engaged in the hazardous operations of mining, and after production attack a lease for lack of the Secretary's approval, which lease such party had theretofore admitted to be valid and binding. The case is not in point. The producer has not asserted any such claim, and whether the assignments of the Indian leases be regarded as void or voidable, the federal court did not hold that a prospective vendee could be coerced into the acceptance of even a voidable title. An *executed* agreement is not involved, and the proposed vendee or lessee is not here claiming rights and benefits minus the burdens of a leasehold. The feverish excitement in oil fields, and guesses as to wealth beneath the surface of the earth, with values, potential or otherwise, often more

fickle than the weather, do not admit of the deliberation frequently employed in perfecting titles to ordinary real estate. The correspondence shows that Pierce himself did not know the names of the sub-lessees; one of his letters about it, and the allegations of his and McCall's complaint conflict. Producer was not required to wait on unduly slow processes. It was not obliged to accept a defective title, when the agreement, if any, express or implied was for a good one. *Rule v. Link,* 84 Colo. 82, 267 Pac. 1005. In the present case this applies not only to the two per cent overriding royalty from vendors, but also to the acquirement of a further interest in the lease to come from California, both of which were conditions precedent. Producer cannot be forced to take a title different in character from that bargained for, if there was a bargain. *Groves v. Stouder,* 58 Okla. 744, 161 Pac. 239. There was no delivery or tender of any kind of an assignment to the producer before suit, and the purported tender was defective.

9. We cannot endorse Pierce's methods of conveyancing. By an instrument dated July 10, 1925, Exhibit OO, vendors sought to assign their interest in the leasehold covering section 14, subject to approval of the Secretary of the Interior, to James Thomson of Whittier, California, and C. G. Staley of Lemon Grove, California, with exception of the royalty reserved to the Indians, and a further overriding royalty of two per cent reserved in vendors. Later, according to Pierce's oral testimony, it developed that Thomson dropped out of the scene; that Staley took over his interests, and that thereafter Staley dropped out, and Orson L. Early took over the interests of both Thomson and Staley. No written assignment appears covering the Thomson-Staley-Early deal, but in lieu thereof, Pierce, in some way got hold of Exhibit OO again, and scratched out the names of Thomson and Staley, and inserted the name of Orson L. Early as assignee of the interest. Vendors rely on this imperfect chain to establish the allegations

of their complaint, but obviously it is bad, not only as to missing links, but also as to the alteration of the instrument, to say nothing of the misspelling of Early's name. It is to be kept in mind that the interest to be acquired by producer as a condition to drilling was not merely vendor's two per cent overriding royalty, nor a royalty strictly as such, in the sense of payments reserved by owners of the fee who have leased their property. Such owners, in this case, are the Indians. On the contrary, vendors were to have received a valid assignment of the lease, ostensibly from Early, whose interest is deraigned through vendors. The relinquishment of two per cent overriding royalty from vendors to producer would thus go to enhance the value of producer's leasehold by reduction of outstanding royalties. It all failed to materialize, and all the defects in title come back to vendors' door, from whence they emanated.

Pierce says he acted as he did in order to save time, but where the title was blown from place to place must be determined by other investigators. It is sufficient for us to know that it did not reach the producer. Pierce admits that he does not know whether Early can legally convey or not, but there is an indication that contingent ownership may be in Early, with a reservation of royalty to the Indians, and an overriding royalty in vendors, subject to whatever the Secretary of the Interior may say, and whatever Thomson and Staley may or might do, if anything, as to the interest that vendors once attempted to assign to them, but which they have not reassigned to any one, except perhaps by a supposed assignment to Early by word of mouth. Neither Thomson, Staley nor Early are parties to this action. The mystic character of the title amply justifies the defense in producer's answer that it could not legally nor with security enter into drilling operations. Some of the defects were unknown to the producer during negotiations. It was mislead as to the status of the leasehold interest, by a letter from Pierce to Yingling,

dated April 15, 1926, but the defects are patent now, and we will not rob the producer of its good fortune in making the discovery before drilling. It is only fair to counsel for all parties to say that none of them had any part in the making or alteration of the unique document mentioned.

10. We are referred to *Sanzenbacher v. Howard-Clay Oil Co.*, 283 Fed. 13, on the question of evidence to establish lease values, if contract to drill a well had been performed, but discussion of evidence concerning such values as tending to show damage, is checked by our view that the contract alleged was not proven.

The novelty, interest and importance of this case have commanded a search of authorities beyond those found in the briefs. We have found no adjudication or text to sustain an action founded on similar facts, nor can we conceive of any good reason for it. Vendors were rightly nonsuited.

Judgment affirmed.

MR. CHIEF JUSTICE WHITFORD, MR. JUSTICE ALTER and MR. JUSTICE CAMPBELL concur.