No. 13,507.

Gage *v.* Young et al.
(33 P. [2d] 389)

Decided May 21, 1934.

Mr. Raymond L. Sauter, Mr. Raymond M. Sandhouse, for plaintiff in error.

Mr. M. M. Bulkeley, Mr. Geo. F. Harsh, for defendants in error.

*In Department.*

Mr. Justice Butler, sitting for Mr. Chief Justice Adams, delivered the opinion of the court.

Milton G. Gage sued William G. Young, Elmer Wiebers, Sam Fulmer and William J. Gallon for specific performance of an alleged contract to sell real estate. A demurrer to the complaint was sustained, the plaintiff stood upon his complaint, the suit was dismissed by the court, and the plaintiff seeks a reversal of the judgment of dismissal.

Young was the owner of land in this state and Wiebers, Fulmer and Gallon were his tenants. The bill of particulars filed by the plaintiff sets out at length letters and telegrams that he says constitute a contract whereby Young agreed to sell to him, and he agreed to buy, Young's land.

1. Counsel for the defendants contend that the writings do not describe the land sufficiently to comply with the statute of frauds. The defendants are not in position to urge the point. Their demurrer is a general demurrer for insufficiency of facts; whereas a defense based on the statute of frauds is in the nature of a special privilege and must be pleaded specially, whether the pleading be by demurrer or answer. *Hunt v. Hayt,* 10 Colo. 278, 15 Pac. 410.

2. Counsel for the plaintiff contend that the writings constitute a contract. Counsel for the defendants contend that they do not, and such was the holding of the trial court. We think that the trial court did not err in so holding.

Gage's letters and telegrams were sent from Sterling, Colorado, Young's from Milford, Indiana. All were written in 1933. It seems that Young had offered to sell

his 800 acres to Gage for $8,000, which offer Gage had refused. On March 24, Young offered to sell for $5,000. On April 1, Gage countered with an offer to pay $4,000, which offer Young refused on April 3. Negotiations continued. On May 2, Young wrote to Gage as follows: "Received your telegram. I will not take less than $5000 clear for my 800 A. They are all free of any incumbrance, so I am going to get a decent price when I sell. I have some propositions now that I think will soon mature, also am in correspondence with a man who intends renting the 320 A. in Yuma Co. Some one is going to get these farms before long, but I am not going to give them away. I do not care whether you accept the offer of $5000 or not, for by the time a few more months have gone by I can get more than that. The recent rains out there has given people much more confidence. Many have advised me not to sell at all now, especially at that price."

On May 6, Gage telegraphed and wrote to Young as follows: "Your offer at five thousand dollars is accepted. Send warranty deed in blank to Security State Bank, Sterling Colorado with instructions by next Saturday and I will pay fifteen hundred dollars to them on the deal when they receive deed remainder of money to be paid as soon as clear title is shown and such collateral papers as leases and insurance policies are ready for delivery with the deed."

On May 8, Young answered as follows: "Your telegram came this morning. I want a little more definite information about this deal. I want $5000—clear, for my share on this deal. I will take nothing less. Remember there is to be no charge put to my account. I will pay to have the abstracts brought down to date, other than this I will pay nothing. The $5000 is to be delivered to me clear from any other charge than what I have mentioned, whether you are buying the 800 a. or whether some one else. I want everything plain and understood. * * * You can send the money in any way that you want,

but do not want it to go thru a bank. * * * Answer directly as to what you will do and I will send all papers to a party who is attending to our business and will deliver the papers to be abstracted. This man will hold these papers until the money which you agreed to pay upon receipt of the deed. He will then turn over to you the deed. We will pay the 1932 taxes and hold the leases for this year's crops, to which we are entitled. The leases expire Mar. 1—'34. Without doubt you can get both leases in the Logan Co. places renewed. Will not give the man who wants to rent the Yuma Co. farm a definite answer, until word is received from you.

"I will wait an immediate answer."

On May 13, Gage telegraphed and wrote to Young as follows: "Proposition your letter May eighth for payment of money is satisfactory. However you made no reservation in deal that possession and nineteen thirty three crops do not go with sale. Rush instructions for delivery of papers and payment of money. Wire me now so definite arrangements can be made for this years planting and crops. This years crops go with deal as you made no reservation. Notices of purchase filed of record today."

And thereupon the correspondence ended.

Counsel for Gage contend that there was an acceptance of Young's offer; that as the offer contained no reservation of the leases for the 1933 crops, the crop rentals for that year belonged to Gage as a matter of law; and that after Gage's acceptance of the offer, Young had no lawful right to attach a new term to the offer. It is true that in the absence of an agreement to the contrary, the crop rentals would have gone to a purchaser; nevertheless, the parties had a right to contract with reference thereto. From the correspondence, it appears that the negotiations were still in a preliminary stage, and that the minds of the parties had not met on this essential term. In *Pierce v. Marland Oil Co.*, 86 Colo. 59, 65, 278 Pac. 804, we said that while contracts may be made by mail and

telegraph, "courts scrutinize closely correspondence and telegrams," and quoted with approval the following statement in 1 Warvelle on Vendors (2d Ed.), section 100, at page 133: "In many instances such letters are intended merely as preliminary negotiation. Proposals are made and views exchanged; prices are discussed, and suggestions offered relative to the property under consideration. From all this a strict construction might possibly deduce a contract within the meaning of the statute of frauds, and yet such might not have been the actual intent of the parties. The question, therefore, in such cases always is: Did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they formally proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound? If upon this view it appears that the letters were merely the basis for a contract, or if it is reasonably doubtful whether what passed was only treaty, no action can be maintained on them. This is particularly true if the party attempting to enforce the contract has done nothing under it."

In our opinion, the trial court was right in holding that there was no contract.

The judgment is affirmed.

MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND concur.