**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 3/25/96**

**TENTH CIRCUIT**

_____

| | |
|---|---|
| NEW YORK LIFE INSURANCE COMPANY, a New York insurance company, | ) ) ) |
| Plaintiff-Appellant, | ) ) |
| v. | )  No. 95-1044 |
| | ) |
| K N ENERGY, INC., a Kansas corporation, | ) ) |
| Defendant-Appellee. | ) ) |

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 93-Z-2284)**

_____

David W. Stark (Lisa A. Osman with him on the briefs) of Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, Colorado, for Plaintiff-Appellant.

Miles Cortez, (Kim E. Laakso of McKenna & Cuneo, Denver, Colorado, and Bradley J. Holmes of K N Energy, Inc., Lakewood, Colorado, with him on the brief) of McKenna & Cuneo, Denver, Colorado, for Defendant-Appellee.

_____

Before **BRORBY, McWILLIAMS** and **LUCERO**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____

New York Life Insurance Company (hereafter New York Life) brought suit against K N

Energy, Inc. (hereafter KNE) for breach of assigned contract, breach of contract as a third party

beneficiary, breach of the duty of good faith and fair dealing, and breach of contract implied in fact. The district court granted KNE's motion for summary judgment on all of New York Life's claims, denied New York Life's motion for partial summary judgment on its third-party beneficiary claim and dismissed the case. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

The key facts in this case involve a letter (hereafter The Master Commitment) written by The Prudential Insurance Company of America (hereafter Prudential) discussing an agreement with KNE to refinance some of KNE's debt. In the letter, Prudential stated it was pleased to confirm the "agreement in principle" to purchase or arrange for the purchase by another institutional investor of "40,000,000 principal amount of __% Senior Note(s) due __ of K N Energy, Inc." The letter also provided that KNE would pay Prudential a rate lock cancellation fee if the interest rate was fixed and the financing did not close.

Regulatory complications made it necessary for Prudential to obtain a "no-action letter" from the Securities Exchange Commission before it could complete the transaction with KNE. While Prudential sought the "no-action letter" it negotiated with New York Life to serve as a backup lender. In exchange for serving as a backup lender, Prudential granted New York Life the right to purchase a minimum of $15, 000,000 of KNE's notes. When it became apparent that Securities Exchange Commission approval was not going to be granted, Prudential informed KNE that it would not be able to make the loan. New York Life then stepped in to make the entire loan on the terms listed in the letter between Prudential and KNE. KNE refused to deal with New York Life, however, and procured a loan from another institutional investor at a lower interest rate. New York Life brought

2

this suit to recover damages, claiming alternatively that it was a third party beneficiary to KNE's agreement with Prudential, Prudential had assigned its interests in the agreement to New York Life, KNE breached its duty of good faith and fair dealing, and that KNE had an implied in fact contract with New York Life.

The district court held the Master Commitment was best characterized as an agreement to agree. The court also held that even if the Master Commitment was a binding contract, there was no evidence to support finding there had been an assignment from Prudential to New York Life, nor was there any evidence to show Prudential and KNE intended New York Life to be a third party beneficiary to the agreement. The district court concluded by holding New York Life's implied in fact contract and breach of duty of good faith and fair dealing claims lacked merit.

On appeal, New York Life raises six issues: (1) the district court erred in ruling that the Master Commitment is not a binding contract; (2) the district court erred in ruling that New York Life is not a third party beneficiary of the Master Commitment; (3) the district court erred in ruling that the Master Commitment was not assigned; (4) the district court erred in ruling there is no implied-in-fact contract between New York Life and KNE; (5) the district court erred in ruling there is no genuine issue of material fact as to whether KNE breached its duty of good faith and fair dealing; and (6) the facts argued by KNE create a genuine issue of material fact regarding whether the Master Commitment is a binding contract

3

I

We review the grant or denial of a motion for summary judgement de novo. *Reich v. Stangl*, 73 F.3d 1027, 1029 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'When applying this standard, we examine the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment.' If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court." *Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)).

In a diversity action, such as this one, we apply the substantive laws of the forum state, including its choice of law rules.[1] *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994). In doing so, "we must apply the most recent statement of state law by the state's highest court." *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994) (citation omitted). Although we are not required to follow the pronouncements of an intermediate state appellate court, we may view such decisions as persuasive as to how the state supreme court might rule. *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864, 869 n.2 (10th Cir. 1993). *But see Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878

---

[1] Although originally there was some dispute regarding whether Colorado or New York law would apply, the parties are not appealing this issue; therefore, we will abide by the district court's decision that Colorado law applies.

F.2d 1259, 1269 (10th Cir. 1989) ("federal court must follow an intermediate state court decision unless other authority convinces the federal court that the state supreme court would decide otherwise.") (citing *West v. AT&T*, 311 U.S. 223, 236-37 (1940)). In our case the apparent discrepancy in how to handle intermediate state court decisions is not material because we find the Colorado Court of Appeals decisions persuasive, applicable and in conformity with Colorado Supreme Court decisions.

We begin by determining whether the Master Commitment created a contract between Prudential and KNE for the purchase and sale of KNE's notes. The Colorado Supreme Court explained in *Greater Serv. Homebuilders' Inv. Ass'n v. Albright*, 293 P. 345, 348 (Colo. 1930) (en banc), that a contract is an agreement to do or not to do a particular thing. "If essentials are unsettled, and no method of settlement is agreed upon, there is no contract.... If the writing leaves the agreement of the parties vague and indefinite as to an essential element thereof, it is not a contract and cannot be made one by parol." *Id.* at 348-49; *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960) (a contract must be definite in its terms to be enforceable). To have an enforceable contract it must appear that further negotiations are not required to work out important and essential terms. *American Mining Co. v. Himrod-Kimball Mines, Co.*, 235 P.2d 804, 807-08 (Colo. 1951) (en banc); *Pierce v. Marland Oil Co.*, 278 P. 804, 806 (Colo. 1929). The Colorado Supreme Court has also noted that "[c]ourts scrutinize closely correspondence and telegrams [because] in many instances such letters are intended merely as preliminary negotiation." *Pierce*, 278 P. at 806 (internal quotation marks and citation omitted). In *Pierce*, the court noted that the essential question is: "Did the parties mean to contract by their correspondence, or were they only settling the terms of an

5

agreement into which they formally proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound?" *Id.* If possible, the parties' intent is to be determined from the face of the contract itself. *Gardner v. City of Englewood*, 282 P.2d 1084, 1090 (Colo. 1955) (en banc).

Although generally, the question of whether a contract exists is a matter of fact to be determined by the jury, this is only the case where "the evidence is conflicting or admits of more than one inference." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986) (en banc). Oddly enough, in its brief New York Life begins its argument that deciding whether the Master Commitment is a binding contract involves resolving material factual issues by stating "there is no genuine issue of material fact." New York Life then attaches various meanings to uncontroverted facts in an attempt to persuade us that material factual issues are controverted. We agree with its initial determination that there are no genuine issues of material fact. In this case, the parties do not dispute what happened, the dispute lies in what legal significance, if any, can be attached to the relevant events.

In light of the above mandates, we must carefully appraise the Master Commitment to determine: a) if its terms are specific enough to constitute a contract; and b) if the parties intended it to be a binding contract. The Master Commitment reads in pertinent parts as follows:

> I am pleased to confirm the agreement in principle of The Prudential Insurance Company of America, itself, or through one or more of its subsidiaries (including but not limited to Prudential Asset Sales & Syndications, Inc.) ("Prudential"), subject to the conditions set forth below, to purchase, or arrange for the purchase by another institutional investor of, $40,000,000 principle amount of

6

__% Senior Note(s) due __ (the "Notes") (priced at 100) of K N Energy, Inc. (the "Company"). Prudential's agreement in principle to purchase, or arrange for the purchase of, the Notes will expire on the Expiration Date. The principal terms of (excluding the maturity date, original principal amount, coupon and required prepayments), and method of purchasing, the Notes would be the same as for the Company's 7.27 % Senior Notes due December 15, 2002 purchased by Prudential on December 15, 1992....

Prudential's purchase of the Notes would be subject to (a) authorization of the purchase by the Finance Committee of Prudential's Board of Directors, (b) Prudential and the Company reaching final agreement upon terms, conditions, covenants and other provisions satisfactory to Prudential to be included in the Notes and the other documents relating to the proposed financing, (c) satisfactory completion of Prudential's investigation of the financial condition and prospects of the Company and its subsidiaries, (d) the absence of any material adverse change in the condition (financial or otherwise) or prospects of the Company and its subsidiaries, (e) payment to Prudential at closing of the Structuring Fee specified below, and (f) the satisfaction of Prudential's Law Department with the documentation, proceedings, legal opinions and other matters in connection with the proposed financing.

Following acceptance by the Company of this proposal, if the interest rate was fixed on all or a portion of the Notes (the date on which such interest rate is fixed is referred to herein as the "Rate Lock Date") and the financing does not close

(a) (i) on the originally scheduled closing date designated on the Rate Lock Date ("Initial Scheduled Closing Date") to the extent the interest rate fixed includes a spread component for a specific period of delayed delivery, and (ii) within 30 days after the Rate Lock Date to the extent the interest rate fixed does not include a spread component for any specific period of delayed delivery, then, in either case, on the earlier to occur of the actual closing date and the Cancellation Date, the Company will pay Prudential the Rate Lock Delayed Delivery Fee, and

(b) by the Cancellation Date for any reason, other than solely due to the failure of the condition described in clause (a) of the second paragraph of this letter, then on the Cancellation Date the Company will pay Prudential the Rate Lock Cancellation Fee.

The Company shall pay Prudential a Structuring Fee of $40,000 payable on the day this letter is signed by the Company.... Prudential shall be responsible for the fees, charges and disbursements of its counsel and all out-of-pocket expenses of Prudential. In the event that the proposed transaction is not consummated as the result of the failure of the Finance Committee of Prudential's Board of Directors to

7

authorize the purchase of the Notes, Prudential will return the Structuring Fee (without interest) to the Company.

If the terms and conditions described above are acceptable to you, please so indicate by signing the enclosed copy of this letter in the place provided and returning the same to me.

We hold the above letter is insufficient to constitute a contract under Colorado law. The letter clearly serves the parties' goals of "settling the terms of an agreement into which they formally proposed to enter after all of the particulars had been adjusted and by which alone they intended to be bound" rather than forming a binding and fully integrated agreement. *Pierce*, 278 P. at 806. Restricting our interpretation strictly to the four corners of the document it is evident that the parties left many terms and considerations to be resolved by further negotiations and actions. In particular the letter specifically leaves open the interest rate and the maturity date of the note: two terms material to the agreement. New York Life maintains that a subsequent letter to KNE from a senior associate at Prudential supplied the missing terms. This letter states:

> We hereby confirm that, pursuant to your request, the interest rate of 7.22% has been fixed today for $40,000,000 principal amount of 15 year average life Senior Notes, due 2013 of K N Energy Inc. (the "Company"), 25,000,000 of which will be purchased by The Prudential Insurance Company of America, itself or through one or more of its subsidiaries or designees, and 15,000,000 of which will be purchased through Prudential Asset Sales & Syndications, Inc. by New York Life Insurance Company from the Company. Funding is scheduled to occur on Tuesday, August 31, 1993.

While we recognize that under Colorado law a contract may be evidenced by two or more writings, *Grizzly Bar, Inc. v. Hartman*, 454 P.2d 788, 791 (Colo. 1969) (en banc), this additional letter does not cure all the Master Commitment's shortcomings. The letter's failure to constitute a contract is also evidenced by the parties' prevalent use of the future subjunctive. In paragraph two, the letter

8

states "Prudential's purchase of the Notes would be subject to" and then it lists several conditions which must occur in order for the agreement to be binding on the parties. This list of conditions precedent exemplifies the letter's lack of the definiteness and finality required to constitute a contract. The letter specifically states that the notes would be subject to "Prudential and the Company reaching final agreement upon terms, conditions, covenants and other provisions satisfactory to Prudential." All the above indicates the parties' anticipation that they would conduct future negotiations to reach "final agreement" upon material provisions.

At best, the Master Commitment can be characterized as an agreement to agree or a contract subject to conditions precedent which were never fulfilled. In either case, KNE would not be bound by such an agreement. *See Griffin v. Griffin,* 699 P.2d 407, 409 (Colo. 1985) (en banc) (agreements to agree are generally unenforceable because courts are unable "to force the parties to reach an agreement and cannot grant a remedy"); *St. Paul Fire & Marine Ins. Co. v. Estate of Hunt*, 811 P.2d 432, 434 (Colo. Ct. App. 1991) (a condition is an event not certain to occur which must occur before performance under a contract becomes due). We therefore conclude the Master Commitment is not a binding contract for the purchase and sale of KNE's notes.

It is also important to note that New York Life candidly conceded prior to oral argument at the summary judgement stage of this proceeding that KNE was not obligated to sell the notes under any type of contract. Instead, New York Life relies on the Master Commitment for the proposition that by failing to sell it the notes KNE became liable to pay New York Life the rate lock cancellation fee. Even if we assume the clause in the Master Commitment regarding the rate lock cancelation

9

fee to be a binding commitment, this claim would lack merit. "The interpretation of a contract requires the court to ascertain the parties' intent at the time the document was executed, and that intent is to be determined primarily from the instrument itself." *Hefley Ranch, Inc. v. Stewart*, 764 P.2d 415, 416 (Colo. Ct. App. 1988). The Master Commitment states that should the financing not close for any reason other than failure of Prudential's Finance Committee to authorize the transaction, KNE would pay Prudential the rate lock cancellation fee. A strict reading of the four corners shows that the rate lock cancellation fee was to be paid to Prudential; New York Life is not mentioned anywhere in the letter, nor is there any indication that any entity other than Prudential would be paid the rate lock cancellation fee.

Furthermore, even if we were to find the express language of the letter to be ambiguous and look to surrounding circumstances, it is clear that New York Life was never intended as a beneficiary of this clause. *See Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo. 1984) (en banc) (when the terms of a contract are ambiguous "the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties"). In particular, Jay Squires, assistant general counsel for Prudential, stated that when KNE and Prudential negotiated the clause it was "not intended as a penalty" for KNE not closing the deal but "merely reimbursement for out-of-pocket costs." In fact, Mr. Squires warned New York Life that the "commitment letter may not give [it] a very enforceable legal claim to try to get the break fee." It is also important to note there is no evidence showing that at the time the letter was drafted, KNE was even aware of New York Life's arrangement with Prudential. Under either analysis, it is clear that neither Prudential nor KNE, the parties who participated in forming the Master Commitment, intended New York Life to be able

10

to recover the rate lock cancellation fee under any circumstances.

## II

Next, we turn to New York Life's claim that it had an implied in fact contract with KNE. "Implied in fact contracts arise from conduct of the parties which evidences a mutual intention to contract with each other." *Tuttle v. ANR Freight System, Inc.*, 797 P.2d 825, 829 (Colo. Ct. App. 1990). Although implied in fact contracts can be based on the conduct of the parties, "there must be a meeting of the minds before any contract will be implied." *A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo. Ct. App. 1982). New York Life claims that KNE's knowledge that New York Life was participating as a backup lender and participating lender entitles New York Life to recover the rate lock cancellation fee. However, as we noted above, the rate lock cancellation fee was specifically negotiated in the letter between KNE and Prudential. This letter was drafted and signed without any reference to New York Life's participation. New York Life has not produced any evidence to show that KNE ever discussed the possibility of a rate lock cancellation fee with New York Life. There simply are no grounds to support the theory that KNE, Prudential or New York Life had any type of meeting of the minds regarding New York Life's entitlement to the rate lock cancellation fee. For these reasons, the district court properly dismissed New York Life's claim that it had an implied in fact contract with KNE.

## III

Our findings that the Master Commitment is not a contract and that no implied in fact contract existed between New York Life and KNE dispose of New York Life's remaining claims. In order to be a third party beneficiary to a contract, there must first be a valid contract. *Parrish Chiropractic Centers, P.C. v. Progressive Casualty Ins. Co.*, 874 P.2d 1049, 1056 (Colo. 1994) (en banc) ("[a] person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party"). Similarly, New York Life's claims that the district court erred in finding that the Master Commitment was not assigned necessitates the finding that there was a valid contract capable of being assigned. *McCormick v. Diamond Shamrock Corp.*, 487 P.2d 1333, 1335 (Colo. 1971) (an assignee takes only as good a claim as the assignor had). Finally, the duty of good faith and fair dealing is only present in fulfilling the terms of a valid contract. *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. Ct. App. 1994) ("Every *contract* contains an implied duty of good faith and fair dealing." (emphasis added)).

For the above stated reasons the district court's order is **AFFIRMED**.