FILED
United States Court of Appeals
Tenth Circuit

**March 16, 2010**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

BLAIR-NAUGHTON L.L.C., doing
business as Goodland Steakhouse
Diner; MICHAEL D. NAUGHTON,
Trustee of the Brian Naughton
Insurance Trust No. 1,

                Plaintiffs-Appellees

v.

DINER CONCEPTS, INC., a Georgia
Corporation; DAVID H. BERNSTEIN;
DINERMITE DINERS, INC.,

                Defendants-Appellants.

No. 09-3019
(D.C. No. 6:06-CV-01183-JTM)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **GORSUCH** and **ANDERSON,** Circuit Judges**,** and **BRORBY**, Senior
Circuit Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This is a tale of two diners. The first is the vintage 1950s-style aluminum-sided diner with rounded vestibule that plaintiffs claim they were entitled to receive under their contract with defendants. The second is the diner that defendants actually delivered: an inferior product with no aluminum siding, a square vestibule, and a plethora of lesser defects including a leaky roof and windows, a sagging floor, ill-fitting doors, and mis-matched ceiling tiles.

Defendants' principal position at trial was that they built the diner called for in the contract. The diner plaintiffs sought, defendants argued, would have been worth hundreds of thousands of dollars more than the diner they actually paid for. Plaintiffs' position was that defendants cheated them out of the diner they contracted for by switching the architectural plans.

Ultimately, the jury chose to believe plaintiffs' account rather than defendants'. It awarded a sizeable verdict in plaintiffs' favor. On appeal, defendants do not challenge the jury's decision in favor of plaintiffs. But they do challenge the amount the jury awarded. Because the amount the jury awarded cannot be sustained under the law and the evidence, we VACATE the judgment and REMAND for entry of an amended judgment as set forth herein.

## BACKGROUND

In summarizing the facts proved at trial, we necessarily view the evidence in the light most favorable to plaintiffs, as they were the prevailing parties at trial. *Escue v. N. Okla. Coll.,* 450 F.3d 1146, 1156 (10th Cir. 2006).

Tom Blair, a member of plaintiff Blair-Naughton, LLC ("Blair-Naughton"), testified that before contracting with defendants he ran a restaurant bar in Binkelman, Nebraska called Western Keg. Sometime in 2003, representatives of the city of Goodland, Kansas ate at his restaurant, enjoyed their meal, and told him that they needed a restaurant like his in Goodland. Mr. Blair consulted with his best friend, Brian Naughton, a business financier, about the possibility of constructing a restaurant in Goodland.

Representatives of the Goodland Community Development Center helped the men conduct a traffic study near the intersection of Interstate 70 and State Highway 27. Mr. Blair and Mr. Naughton concluded that while the volume of traffic was sufficient for profitability, they needed a restaurant design that would bring people into their restaurant from off of the highways. To attract the eighty percent of their customers they estimated would come from highway traffic, they settled upon "a vintage type '50s - '60s glossy, stainless steel diner." Aplt. App. at 504-05.

The two men acquired a parcel of land near the highway intersection. They then set about finding a company that could construct the diner they wanted. Mr. Blair did some Internet research concerning modular-type restaurants. His research led him to defendant Dinermite Diners, Inc. ("Dinermite"), a company in Georgia. Don Memberg, then Dinermite's Marketing Director, provided Mr. Blair

with a brochure containing a photograph of a stainless steel diner that Mr. Blair

testified was "[d]efinitely what we wanted." *Id.* at 508.

After further discussions, Mr. Blair and Mr. Naughton, who by then had

organized Blair-Naughton,[1] signed a sales contract with defendant Diner

Concepts, Inc. ("Diner Concepts").[2]  The contract called for "the sale, purchase

and delivery of a standard 120 seat Happy Days Diner with Vestibule + Bar,"

referred to as the "Goodland Steakhouse Diner."  ("Diner").  *Id.* at 1150

(quotation marks omitted).  Blair-Naughton purchased the Diner for $537,500.

The purchase price included the cost of delivery and placement of the modular

diner unit onto their footings/foundation in Goodland.  The contract called for the

purchase price to be paid in five installments, the first due at execution of the

contract.  Significantly, the second installment, in the amount of $163,175, was to

be paid "upon receipt of Approval Plans."  *Id.*

The Diner was to be built and equipped as per certain exhibits to the

contract.  Key among these was Exhibit "A," the Approval Plans for the Diner.

But these Approval Plans were not actually complete at the time the contract was

executed.  Instead, an otherwise blank page attached to the contract provided that

---

[1]     Mr. Blair is the surviving member of Blair-Naughton.  Mr. Naugton died in July 2005.

[2]     Mr. Bernstein later testified that Diner Concepts was organized as a separate company from Dinermite, with the idea that Diner Concepts would contract to build less expensive modular diners than those constructed by Dinermite.

"State Certified Plans Will Become Attached to Contract as Exhibit 'A'" and

provided the following notice:

> Seller will supply up to three (3) full sets of original raised
> engineered stamped/sealed plans and up to three (3) photo static [sic]
> copies for Purchaser's use.  Additional sets needed by Seller are at
> additional cost.  Purchaser must return to Seller a full set of plans
> with each and every page signed by Purchaser to indicate approval
> and authorization for Seller to begin construction.

*Id.* at 1156.

Thus, the contract contemplated that before construction began defendants

would have in hand a set of plans that were both approved by Blair-Naughton and

stamped or sealed by an engineer.  But that is not what happened.  Instead, two

separate sets of plans passed between the parties like ships in the night.

Defendants first provided a set of plans to plaintiffs known as the "Kretch"

plans.  These plans called for just the sort of diner plaintiffs wanted:  an

aluminum-sided model with rounded vestibule.  The "Kretch" plans, though

approved and signed by Blair-Naughton and returned to defendants, were never

stamped by an engineer.  Defendants did not use them in constructing the diner.

It was defendants' position at trial that the Kretch plans were generic plans

for an upscale diner to be used for bidding purposes only and that they were sent

to plaintiffs by mistake.[3]  The Kretch plans, defendants explained, were never

---

[3]    Defendants' position required them to explain a letter Mr. Memberg sent to
Blair-Naughton on June 6, 2005, referring to the Kretch plans as Approval Plans
and invoicing Blair-Naughton for the second installment payment due under the
(continued...)

intended to be used in construction of the economy-class "Happy Days" diner called for under their contract with Blair-Naughton. In an effort to demonstrate the absurdity of plaintiffs' reliance on the Kretch plans, Mr. Bernstein testified that had the Diner been constructed using those plans, it would have been worth between $800,000 and $900,000, a sum hundreds of thousands of dollars in excess of the contract price. This estimation would return later to haunt defendants.

In September 2005, defendants forwarded a second set of plans, known as the "Wilkins" plans, to an attorney working with Blair-Naughton. Unlike the Kretch plans, these plans had been stamped by an engineer. But they called for a diner design inferior to that of the Kretch plans, with, for example, no stainless steel exterior and with wooden two by six floor joists rather than steel purlins. The "Wilkins" plans were never approved or signed by Blair-Naughton.

Each party proceeded according to plan. Unfortunately, it was not the same plan. Blair-Naughton had a concrete foundation constructed on their premises designed to support a diner built on the "Kretch" design. Defendants contracted

---

[3](...continued)
contract, which was to be paid upon receipt of the signed Approval Plans. Aplt. App. at 1323. Defendants contended that Mr. Memberg sent the plans and the invoice without authorization. But they also admitted that they cashed Blair Naughton's check and did not attempt to refund the $163,175 Blair-Naughton paid with their approval of the Kretch plans.

with Wilkins Mobile Builders, Inc. ("Wilkins") to build a modular diner according to the "Wilkins" plans.

Blair-Naughton never inspected the modular diner before it was delivered, even though the contract permitted it to do so. (Mr. Blair later claimed defendants discouraged him from conducting an inspection.) Installing the "Wilkins" diner on the "Kretch" footings, in addition to other serious deficiencies with the Diner as constructed, proved disastrous.

There were few happy days for the Goodland Steakhouse Diner. Mr. Blair testified that the floors were uneven and later cracked and buckled; that the windows were not square in the walls and were improperly sealed and caulked, causing all of them to leak; that the doors did not fit properly; that the counter tops were at an improper distance from the floor; that the customer booths were square rather than rounded as they should have been; that the lighting did not match up with the tables; that the bathroom fixtures were improperly installed; that the walls were "wavy"; that the ceiling tiles were mis-matched; that the bathroom doors were not hung properly; that the modules did not match properly; that the appliances were different from what he was supposed to have received; that the floor tiles cracked; and that the roof leaked so badly it had to be replaced. The Diner nevertheless opened on the inauspicious date of 06/06/06. It later closed after only about twenty months of operation.

Plaintiffs presented testimony from Glen Strait, an architect. He examined the Diner and called it "substandard," with poor workmanship. *Id.* at 641. He stated it was "the poorest example of a building that I have seen." *Id.* He described defects similar to those testified to by Mr. Blair and also noted evidence of mold growth resulting from moisture problems in the building. He did not consider the flooring to be safe. To bring the Diner up to what it should have been, he opined that the existing building should be demolished or removed and that it would be necessary to start over with construction on the existing foundation. His estimate of the cost to do this was $717,166.80.

In addition to suing defendants for breach of contract, plaintiffs sought damages for breach of warranty.[4] The breach of warranty claim was based on a provision of the contract specifying the Diner would be "free from defects in material and workmanship for a period of one . . . year from the date of delivery." *Id.* at 1153.

The district court instructed the jury concerning damages for breach of contract as follows:

> Generally, the damages for a breach of contract is the difference between the contract price and the fair market value of the property at the time and place for delivery.
>
> Alternatively, if the fair market value of the actual diner is less than its value if it had been delivered as promised, the plaintiff may

---

[4] Other claims, including those for fraud, piercing of the corporate veil, and breach of fiduciary duty, are not at issue in this appeal.

recover as damages the actual cost required to bring the diner up to the level it would have been if delivered as promised.

*Id.* at 904.

Defendants objected to this instruction. They proposed that it be modified to permit the alternative measure of damages only if any defects could be repaired. They also requested language that damages be limited by the fair market value of the property or its contract price, and that the jury be instructed that if the defects could not be reasonably repaired, the measure of damages should be the diminution in value caused by any irremediable defects. *Id.* at 879. The district court denied these proposed modifications to the instruction.

The district court further instructed the jury concerning damages for breach of warranty as follows:

In this case, the measure of damages for breach of warranty would be the difference in value between the diner as built and [the] value the diner would have [had] if it were built in compliance with the warranty.

*Id.* at 905.

Defendants did not object to this instruction. In fact, they affirmatively stated they had no objection to it. *Id.* at 776.

After hearing all the evidence, the jury reached a verdict in favor of plaintiffs. It found that Diner Concepts had breached the sales contract with Blair-Naughton, and awarded plaintiffs $717,166.80 for breach of contract. It also found that Diner Concepts breached the express warranty of freedom from

defect for one year, and awarded plaintiffs $900,000 for breach of express warranty. In order to avoid a double recovery, the district court entered a judgment awarding the $900,000 damages on the breach of warranty claim only.

Defendants subsequently filed a post-trial motion requesting, in the alternative, judgment as a matter of law ("JMOL"), alteration and amendment of the judgment, or a new trial. The district court denied the motion, and defendants appealed.

## ANALYSIS

### 1. Standard of Review

In the district court, defendants primarily argued that plaintiffs had failed to present evidence of fair market value of the diner sufficient to establish damages, and thus had failed to prove their claim. On appeal, they have shifted their emphasis away from sufficiency of the evidence to their alternative argument that "the jury's award is not within the range of damages as established by the *unchallenged testimony and uncontroverted evidence* presented at trial," thus entitling them to a new trial on the issue of damages. Aplt. Opening Br. at 26 (emphasis added).

Thus, we do not view defendants' challenge on appeal as a renewed attempt to seek judgment as a matter of law on plaintiff's claims.[5] Rather, defendants

---

[5]  *See Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) ("A party is entitled to JMOL only if the court concludes that all

(continued...)

only seek either a new trial on the damage issue or alteration and amendment of the judgment. "We review a district court's disposition of a motion for . . . new trial on damages for a manifest abuse of discretion." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1143 (10th Cir. 2002) (quotations omitted). "Under this standard, the jury's award is inviolate unless we find it so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009). A trial court's ruling on a motion to alter or amend a judgment is similarly reviewed for an abuse of discretion. *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1286 (10th Cir. 2005).

Since this case is grounded on diversity jurisdiction, we apply the appropriate state substantive law as announced by that state's highest court. *See Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998). Although the forum state is Kansas, the parties agreed in their contract to apply Georgia law to matters involving the contract and they agree that Georgia law governs this dispute. The applicable Georgia law was presented to the jury by way of the district court's instructions. "We review the district court's decision to give a

---

[5](...continued)
of the evidence in the record reveals *no legally sufficient evidentiary basis for a claim* under the controlling law.") (quotation and internal alterations omitted) (emphasis added).

-11-

particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *Garcia v. Wal-Mart Stores, Inc.*, 209 F.3d 1170, 1173 (10th Cir. 2000) (quotation omitted).

## 2. Diminution in Value

The jury awarded plaintiffs $900,000 for breach of warranty. This award is excessive and cannot stand. It exceeds the estimated cost of rebuilding the diner from scratch to plaintiffs' expectations, as reflected in the jury's award on the contract claim. The cost of rebuilding constitutes the maximum award available in this case under Georgia law.

As noted, the jury was instructed that the proper measure of damages was "the difference in value between the diner as built and [the] value the diner would have [had] if it were built in compliance with the warranty." Aplt. App. at 905. This instruction relied on the "diminution in market value approach," one of two approaches endorsed by Georgia law to calculate damages for defective construction. *See John Thurmond & Assocs., Inc. v. Kennedy*, 668 S.E.2d 666, 668-69 (Ga. 2008) (describing "cost of repair" and "diminution in value" approaches). Reduction in fair market value is the essence of this "diminution" approach, which finds its origins in the Restatement (Second) of Contracts § 348. *See John Thurmond*, 668 S.E. 2d at 668. The Restatement indicates that the

applicable measure is "the diminution in the market price of the property caused by the breach." Restatement (Second) of Contracts § 348(2)(a).

This diminution in value approach, however, does not operate in isolation from considerations involving the cost of repair. The overriding principle is that "damages are intended to place an injured party, as nearly as possible, in the same position they would have been if the injury had never occurred." *John Thurmond*, 668 S.E. 2d at 668. Thus, even where courts use the diminution in value approach, the cost of putting the property in the condition for which the plaintiffs contracted constitutes an upper limit to the amount that may be awarded. *See Hutto v. Shedd*, 353 S.E.2d 596, 598 (Ga. Ct. App. 1987) (capping damages at cost of placing house in condition for which plaintiffs contracted). The repair cost in this case, as established by the jury's verdict on the contract claim and testimony from plaintiffs' expert, is $717,166.80. Thus, the jury's award of $900,000 was excessive, and must be reduced to $717,166.80.[6]

This approach merely reflects common sense. If plaintiffs received an amount their own expert estimated was sufficient to rebuild the diner from the

---

[6]    This estimate relies on the costs of tearing down the existing structure and starting over, a procedure disapproved of by the Georgia courts in cases where the builder has substantially complied with the contract specifications. *See John Thurmond*, 668 S.E.2d at 669-70. Here, however, the breach was so serious and the structure so defective that we believe the Georgia courts would conclude that the cost of rebuilding from scratch was not an unreasonable or disproportionate measure of damages. Moreover, for reasons we have explained, this measure was actually more fair to defendants than a measure based strictly on difference in fair market value.

ground up to their specifications, the fact that such a reconstructed diner might have a fair market value in excess of the repair cost would not justify an additional award of damages. Under the cost-of-repair approach, plaintiffs can have the diner they contracted for, with whatever market value it possesses, for a cost of $717,166.80. Anything more than this figure represents an unjustified windfall to plaintiffs.

### 3. Salvage Value

We turn next to the salvage value question, which affects both the contract and warranty awards. In each case, it is clear the jury assigned zero value to the diner the defendants actually constructed. The question is whether this value comports with Georgia law and the evidence.

In calculating the warranty award, the jury was required to examine the difference between the value of the diner as built and as it should have been built. The only evidence that supported the $900,000 figure it awarded came from Mr. Bernstein's estimate that the diner would have been worth $800,000 to $900,000 if constructed in accordance with the Kretch plans. As the parties recognize, assuming the jury relied on the high end of Mr. Bernstein's estimate to set the value of such a diner at $900,000, to reach the differential figure it did, it must have assigned zero value to the diner as built.

In its breach of contract award, the jury also assigned the diner a zero value. The jury applied the alternate measure of damages described in the district

court's instruction, involving the "actual cost required to bring the diner up to the level it would have been if delivered as promised." Aplt. App. at 904. The damage figure it adopted was identical to the estimate proposed by plaintiffs' expert Mr. Strait. In preparing his estimate, Mr. Strait assigned no surplus or salvage value to the existing structure or any of its components. Thus, it is clear the jury gave defendants no credit for these items.

Defendants argue that assigning zero value to the diner or its components was inconsistent both with Georgia law and with the evidence. They contend that Georgia law required the jury to recognize that even a "worthless" building has some scrap value, for which they should have been given credit in the damage calculation. They contend that they both put on uncontested proof of items of residual value and argued to the jury that they deserved credit for portions of the diner that could be re-used even if it were torn down.

Defendants' position finds some support in Georgia law. Even a "worthless" structure "has some value, if only for scrap" and "the owner should not have the benefit of that value, however low, by recovering the entire contract price." *Ray v. Strawsma*, 359 S.E.2d 376, 378 (Ga. Ct. App. 1987). Although plaintiffs argued that the diner as constructed was useless to them as a restaurant, such argument "addressed the usefulness of the [diner] and not its value" and "wholly ignores the fact that salvage value alone gives substantial value" for which defendants should be credited. *Hutto*, 353 S.E.2d at 597.

-15-

Unfortunately for defendants, however, the burden of establishing scrap or salvage value, and how it operated to reduce the award, lay squarely with them rather than plaintiffs. Plaintiffs put on evidence that the diner could not be fixed and that in order to receive the benefit of their contract, they would have to raze the modular structure to the ground and start over. In response to this showing, defendants had "the burden to present any contradictory evidence challenging the reasonableness or proportionality of those damages and where appropriate, evidence of an alternative measure of damages for the jury's consideration." *John Thurmond*, 668 S.E.2d at 669. *See also SE Consultants, Inc. v. O'Pry*, 404 S.E.2d 299, 301 (Ga. Ct. App. 1991) (noting subcontractor defendants "had ample opportunity to show that the house at least had some 'scrap value,' but there is no such evidence" and hence plaintiffs' estimate of zero value would be accepted).

Defendants made at least some effort in this direction. Although they called no witness to estimate the salvage or scrap value of their deficient diner, they did ask plaintiffs' expert Mr. Strait some questions about residual value during cross-examination. In preparing his estimate, Strait had identified certain "potential salvage items and equipment," including "kitchen equipment, rooftop heating/cooling units, ductwork, ceiling diffusers and grilles," "exhaust fans and grilles," "lighting fixtures," "electrical switch gear," and "plumbing fixtures."

Aplt. App. at 1349. But he did not assign any dollar value to any of these items. Nor did he characterize them as other than "potential" items for salvage.

On cross-examination at trial, Mr. Strait admitted that the existing air conditioning units could be reused on a new building. If the existing units were removed from the roof, stored, and reinstalled, he estimated, the net cost savings from his estimate to rebuild the diner using the Kretch plans would be approximately $20,000. He was not asked, however, about the specific savings that might result from the remainder of the components on his list of potential salvage items. There was no testimony elicited concerning what it would cost to remove, store, and reinstall these items or how much residual value they had, if any.

Strait's estimate of the rebuilding cost did not include the value of the kitchen package, though he listed it as an item that might be salvaged from the existing building and testified that he thought it "had value." *Id.* at 693. But he did not testify that the kitchen equipment could be reused, and did not quantify its value, the cost of storage, or the cost of reinstalling it. Defendants argue that the value of the kitchen equipment can be determined from other evidence in the record. They point to the fact that the Kretch plans included the kitchen equipment, for which they paid $110,199.04. But this falls short of establishing that the kitchen equipment could be reused, the value that should be assigned to it, or why that value should be subtracted from Strait's estimate, which did not

itself include the cost of kitchen equipment. Defendants had the burden of proving the value of the kitchen equipment and the appropriateness of applying that value as an offset, and they failed to meet that burden.

Defendants also argue that they were entitled to a $30,000 credit for mirrored steel on the back of the building, because even under plaintiffs' interpretation of the plans, a "Happy Days diner" didn't have steel on the back of it. But there was conflicting evidence on whether the plans actually required mirrored steel on the back of the building. *See id.* at 698-99. Given this conflict in the evidence, the jury could have rejected defendant's position that they were entitled to a $30,000 credit. Again, defendants failed to meet their burden to establish their entitlement to credit.

Finally, defendants present an argument that does not address salvage or scrap value or entitlement to a credit, but does challenge the jury's calculation of damages. They contend that the value awarded to plaintiffs should have been based upon the damages they sustained at the time and place for delivery. Mr. Strait based his calculations on the cost of rebuilding at the time of trial. He testified that the costs would have been approximately $75,000 less if he had calculated them in January 2006, at the time of breach.

Defendants' argument assumes that the jury awarded damages under the primary measure contained in the contract damages instruction, which required them to determine "the difference between the contract price and the fair market

-18-

value of the property *at the time and place for delivery*." *Id.* at 904 (emphasis added). But as we have already explained, the amount of the jury's award indicates that it applied the alternative measure of damages provided in this instruction, applicable in cases where "the fair market value of the actual diner is less than its value if it had been delivered as promised." *Id.* This measure required it to award as damages "the actual cost required to bring the diner up to the level it would have been if delivered as promised." *Id.* There is no indication in the instruction that this actual cost was to be determined at the time and place for delivery as opposed to the time of trial.

In sum, the only evidence of salvage value sufficiently specific and detailed to meet defendants' burden involved the air conditioning units. Uncontested evidence showed these units had a value of $20,000. Defendants should therefore have been credited $20,000 in the jury's calculation in order to comply with Georgia law.

### 4. Contract Price Limitation

In addition to the offsets defendants claim for salvage value, they seek to reduce the jury's award on their contract claim to no more than the contract price of $537,500. They contend this is the maximum recovery permitted under Georgia law. Defendants submitted a proposed instruction that would have capped recovery at the contract price, which the district court properly rejected.

In *John Thurmond*, the Georgia Supreme Court addressed a similar claim, that damages in construction defect cases could never exceed the fair market value of the property at the time of breach, and rejected application of "an inflexible rule limiting the amount of recoverable damages." 668 S.E. 2d at 669. The court indicated that "the method of calculating damages should be flexible so as to reasonably compensate the injured party, and at the same time, be fair to all litigants." *Id.* at 670.

Defendants' proposed instruction would have deprived the jury of the flexibility required by Georgia law. An award of only the contract price would not reasonably have compensated plaintiffs, because their cost of rebuilding the diner to conform to the contract exceeded the contract price. The fact that plaintiffs will receive more than the contract price they actually paid is not necessarily unfair to defendants. A jury persuaded by plaintiffs' "bait-and-switch" theory could reasonably have concluded that an artificially low contract price was part of the "bait" that enticed plaintiffs into entering into the contract in the first place. Given this possibility, an award strictly limited to the contract price would fail to make the plaintiffs whole.

### 5. Improper "Lost Profits" Testimony

Finally, defendants argue that the district court erred in permitting argument and testimony that allowed the plaintiffs to make a *de facto* claim for lost profits. Georgia's "new business rule" generally precludes a claim for lost

profits arising from the operation of a new business, because such damages are considered too speculative, remote, and uncertain. *See, e.g., SMD, L.L.P. v. City of Roswell*, 555 S.E.2d 813, 816 (Ga. Ct. App. 2001). The district court therefore precluded plaintiffs from presenting expert testimony concerning lost profits. The parties further agreed prior to trial that evidence regarding the earning capacity of the diner as a business, its management, and its chances of success as a restaurant were irrelevant to the contract claim and would not be presented at trial. The district court granted the parties' motions in limine designed to exclude such evidence.

Defendants complain that notwithstanding the district court's in limine order, plaintiffs were permitted to argue over their objection that the reason that the diner failed as a business was that it did not look like a vintage 1950s diner. In their opening statement, plaintiffs' counsel stated over defendants' objection that in order for their business model to work, they needed "a 1950's vintage style diner," Aplt. App. at 309, and he noted that the diner defendants actually built did not meet this requirement, *id.* at 317. Counsel also stated that they had to close the diner because of safety issues with the flooring and because "[t]here is just no way someone driving by the interstate wants to look at that like a 1950 vintage diner. They aren't going to come there." *Id.* at 323. Later, he asked Mr. Blair whether he was able to attract the highway traffic he needed and whether the diner was "open for business today," *id.* at 543, to which Mr. Blair replied no.

-21-

Counsel then asked why the diner was not open for business, to which Mr. Blair replied, over defendant's objection, that "[i]t's not making any money." *Id.*

We agree with the district court that these comments fell short of a de facto argument for lost profits. Counsel's references in his opening statement and the testimony on these points merely illustrated the reasons for plaintiffs' disappointment in the structure that had been delivered to them, and the reasons it failed to meet their expectations under the contract. We therefore affirm the district court's rejection of defendants' motion for new trial on this point.

## CONCLUSION

Plaintiffs could recover no more than their reasonable cost of repair, which in this case involved removing the faulty structure and rebuilding the diner from scratch. In addition, defendants proved their entitlement to $20,000 worth of scrap value for the reusable air conditioning equipment. The district court's judgment is therefore VACATED and the case is REMANDED with instructions to enter an amended judgment in the amount of $697,166.80 ($717,166.80 less $20,000 salvage value).

Entered for the Court


Stephen H. Anderson
Circuit Judge

-22-