FILED
United States Court of Appeals
Tenth Circuit

November 13, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ARTHUR C. WAGNER, JR.,
Individually and for the benefit of
Jean Marie Wagner,

      Plaintiff – Appellee/
Cross - Appellant,

v.

LIVE NATION MOTOR SPORTS,
INC., formerly known as SFX
MOTOR SPORTS, INC., doing
business as Clear Channel
Entertainment-Motor Sports,

      Defendant – Appellant/
Cross - Appellee,

and

HEARTLAND PARK RACEWAY,
LLC,

      Defendant.

No. 07-3365 & 07-3366

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:05-CV-02336-JPO)**

---

Paul M. Croker (Richmond M. Enochs and James L. (Jay) MowBray, on the
briefs), Overland Park, Kansas, for Appellant/Cross-Appellee.

David R. Cooper (Larry G. Pepperdine and Steve R. Fabert with him on the briefs), Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas, for Appellee/ Cross-Appellant.

Before **KELLY, EBEL,** and **MURPHY**, Circuit Judges.

**EBEL**, Circuit Judge.

In this diversity case governed by Kansas tort law, SFX Motor Sports, Inc.[1] ("SFX"), appeals the district court's denial of its post-trial motion for judgment as a matter of law ("JMOL"). SFX argues that a reasonable jury could not have found SFX liable for wanton conduct based on its staging of an August 2003 motorcycle race in which Arthur Wagner, Jr. ("Wagner"), crashed and was seriously injured. Wagner cross-appeals, arguing that the district court erred in reducing his damages award pursuant to Kansas's statutory cap on noneconomic damages in personal injury actions. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we REVERSE the denial of SFX's motion for JMOL and DISMISS Wagner's cross-appeal as moot.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

On August 8, 2003, Wagner competed in the Formula USA 250K Team Challenge Endurance Race at the Heartland Park racetrack in Topeka, Kansas.

---

[1]Since the time of the events at issue in this appeal, SFX has changed its name to Live Nation Motor Sports, Inc. In keeping with the practice of the district court and the parties, we refer throughout to SFX rather than to Live Nation Motor Sports.

SFX staged the race pursuant to its Track Rental Agreement with Heartland Park Raceway, LLC, to which Jayhawk Racing Properties, L.L.C. had assigned its rights to operate the track.[2] In order to participate in the August 8 race, Wagner had signed, the day before, two documents entitled "Release and Waiver of Liability, Assumption of Risk, Indemnity and Rights Agreement." (R. vol. 1 at 142-44.) The first release and waiver, for which "HPT–Topeka, KS" served as the "[d]escription and location of scheduled event(s)," provided as follows:

> IN CONSIDERATION (a) of being permitted to compete . . . or (b) being permitted to enter, for any purpose, any Restricted Area . . . , including but not limited to the competition area . . . , EACH OF THE UNDERSIGNED, for himself/herself, his/her personal representatives, parent or legal guardian, heirs, and next of kin:
>
> 1. Acknowledges, agrees, and represents that he/she has or will immediately upon entering any of such restricted areas, and will continuously thereafter, inspect the Restricted Areas which he/she enters[;] and he/she further agrees and warrants that, if at any time, he/she is in or about Restricted Areas and he/she feels anything to be unsafe, he/she will immediately advise the officials of such and will leave the Restricted Areas and/or refuse to participate further in the Event(s).
>
> 2. HEREBY RELEASE[S], WAIVES, DISCHARGES AND COVENANTS NOT TO SUE SFX Motor Sports, Inc., d/b/a/ Clear Channel Entertainment-Motor Sports, and its affiliates and related companies . . . , track operators, . . . [and] owners and lessees of premises used to conduct the Event(s), . . . all for the purposes herein referred to as "Releasees", FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, parent or legal guardian, assigns, heirs, and the next of kin FOR ANY AND ALL

---

[2]Jayhawk Racing Properties, L.L.C. was, in turn, the assignee of the rights of the City of Topeka, the owner of the racetrack.

LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS
THEREFORE ON ACCOUNT OF INJURY TO THE PERSON OR
PROPERTY, OR RESULTING IN DEATH, OF THE
UNDERSIGNED ARISING OUT OF OR RELATED TO THE
EVENT(S), WHETHER CAUSED, IN WHOLE OR IN PART, BY
THE SOLE OR CONCURRENT NEGLIGENCE OR
WRONGDOING, STRICT LIABILITY OR FAULT OF THE
RELEASEES OR OTHERWISE.

(R. vol. 1 at 142.)  The second release and waiver, indicating "Formula USA

Testing" as the "Description and Location of Scheduled Events," included

identical provisions.  (Id. at 144.)

In addition to signing their releases and waivers on the day before the race,

Wagner and other racers participated in practice sessions on the Heartland Park

track.  During those practice sessions, two riders had to leave the 2.5-mile track

in the area of Corner 10; one rider had run out of fuel, and the other had a

mechanical problem with his motorcycle.  Both motorcycles had to be pushed off

the track.

During the race itself, on August 8, Wagner was entering Corner 10 and

leaning into the left-hand curve when the wheels of his motorcycle hit a rumble

strip, or berm, on the outside edge of the track.  Wagner's motorcycle left the

track, sliding—with Wagner still aboard—somewhere between 100 and 250 feet

across a grass and dirt runoff area before colliding with an unpadded portion of a

moveable concrete barrier.  The motorcycle burst into flames that engulfed

Wagner, who was thrown into the grass.

-4-

Throughout the race, including at the time of Wagner's crash, the track's turns were staffed by "corner workers," who were to act as flaggers to inform racers to proceed with caution or to stop altogether in the event of an accident, and who also were to serve as emergency responders to aid downed racers. Corner workers were provided colored flags, radios with which they were to communicate with the control tower and with other corner workers, and a fire extinguisher. In roughly hour-long meetings on the mornings of August 7 and August 8, the corner workers had been instructed, at minimum, when to use the radio system and what color flags they should wave in the event of an accident.

Corner 10 was staffed by a married couple, Randy and Linda Bodtke, whom SFX had hired through a temporary employment services agency. Like other corner workers at the race, the Bodtkes were positioned on the inside of their corner, behind a barrier that separated and protected them from the riders on the track. When Wagner crashed on the outside of the track, therefore, the Bodtkes and other corner workers had to wait for race traffic to clear, climb over the short wall separating them from the track, and cross the track in order to reach him.

Although Linda Bodtke radioed the control tower and began waving her red and yellow flags when she saw the accident, the racers temporarily continued circling the track at race speed. After the last motorcycle cleared their area, Randy Bodtke and the worker at Corner 11 climbed over the barrier, crossed the track, and reached Wagner. Both carried their fire extinguishers to the crash

scene. The worker from Corner 11 arrived first; Randy Bodtke believed he arrived within a minute of the crash. Both Randy Bodtke and the worker from Corner 11 sprayed their fire extinguishers on the grass around Wagner, and one or the other may also have sprayed his fire extinguisher on Wagner's back. The corner workers had been instructed not to spray fire extinguishers in a crash victim's face; they had also been instructed not to touch or move a crash victim until emergency personnel arrived.

An ambulance and a fire suppression truck responded to the crash scene. However, both vehicles had to wait for a gate to be opened before they could drive onto the infield of the track. Emergency personnel attended to Wagner and placed him on a backboard, and at some point during this process, an unidentified individual called for the life-flight helicopter. Roughly forty-four minutes after the crash, Wagner arrived, by that helicopter, at the KU Medical Center. He was treated for multiple fractures and for serious burns over most of his lower extremities and one hand, and he was hospitalized for several weeks after the accident.

On August 2, 2005, Wagner, who at the time resided in Florida, filed a diversity lawsuit in federal district court for the District of Kansas, pleading negligence and wanton conduct as alternative theories of recovery under Kansas law. Wagner named as defendants SFX; Heartland Park Raceway, L.L.C.; SFX Entertainment, Inc.; Clear Channel Communications, Inc.; and Jayhawk Racing

Properties, L.L.C.  Following discovery, and based on the release and waiver

forms that Wagner had signed before the race, the district court granted SFX and

Heartland Park partial summary judgment on Wagner's negligence claims.  The

court granted full summary judgment to the remaining defendants, because the

record contained no evidence from which a jury might conclude that they owed

any duty to Wagner.  The case thus went to trial solely against SFX and Heartland

Park, and solely on a theory of wanton conduct under Kansas law.[3]

The parties consented to disposition of the case by the magistrate judge,

and after a five-day trial over which he presided, the jury returned a verdict in

favor of Heartland Park and against SFX.  The jury awarded Wagner roughly $2.6

million in compensatory damages.  Following entry of judgment in accordance

with the jury's verdict, SFX moved under Fed. R. Civ. P. 50(b) for JMOL,[4] based

---

[3]In ruling on the defendants' motion for summary judgment, the district court explained that unlike negligence, "[w]anton conduct would be actionable because it falls outside the scope of plaintiff's waiver."  Wagner v. SFX Motor Sports, Inc., 460 F. Supp. 2d 1263, 1271 (D. Kan. 2006) (citing Wolfgang v. Mid-Am. Motorsports, Inc., 898 F. Supp. 783, 788 (D. Kan. 1995), aff'd, 111 F.3d 1515 (10th Cir. 1997), to the effect that "under Kansas common law, [an] attempt to waive liability for wanton conduct [is] unenforceable").

[4]In its briefs, SFX refers to its Rule 50(b) motion by its pre-1991 name, as a motion for judgment notwithstanding the verdict.  As did the district court, we refer to the motion as one for judgment as a matter of law, or JMOL.  See Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1497 n.1 (10th Cir. 1994).

Pursuant to Rule 50(a), SFX had moved for JMOL at the close of both

(continued...)

on a claim of insufficient evidence to support a jury finding of wanton conduct; under Rule 59(a) for a new trial, based on a claim of the court's error in not instructing the jury on comparative fault principles or on the distinction between negligence and wanton conduct; and under Rule 59(e) for alteration or amendment of the judgment, based on Kansas's statutory cap of $250,000 on noneconomic damages in a personal injury action.

The district court denied the motion for JMOL and the motion for new trial, but granted in part the motion to alter or amend the judgment. The court held that because the parties had agreed that substantive issues in the case were to be governed by Kansas law, the state's mandatory cap on noneconomic damages in personal injury cases applied to the judgment against SFX. The court then ordered entry of an amended judgment that reduced Wagner's damages by just over a million dollars.[5]

SFX timely appealed, arguing that the district court erred in (1) not granting its post-trial motion for judgment as a matter of law; (2) not instructing

---

[4](...continued)
Plaintiff's evidence and its own evidence; the district court denied both motions.

[5]The district court explained that the jury award included "$264,625 for noneconomic loss to date, $758,150.62 for future noneconomic loss, and $263,380.91 for loss or impairment of services as spouse, for a combined total of $1,286,156.53 in noneconomic loss." Wagner v. SFX Motor Sports, Inc., 522 F. Supp. 2d 1330, 1345 (D. Kan. 2007). Applying the statutory damage cap, the court reduced this total to $250,000. Id.

the jury on comparative fault, and restricting SFX's introduction of evidence on that subject; (3) not instructing the jury on the definition of simple negligence, and the distinction between simple negligence and wanton conduct; and (4) not granting a new trial. SFX also filed a motion asking that we certify to the Kansas Supreme Court the question of whether, under Kansas law, comparative fault principles apply within an action based solely on a claim of wanton conduct.

On cross-appeal, Wagner argues that the district court erred in reducing his damages award based on Kansas's statutory cap on noneconomic damages in personal injury actions. He further argues that even if the cap does apply in this case, the district court erred in applying it to the portion of the award for loss of spousal support.

## II. DISCUSSION

### A. *Motion for Judgment as a Matter of Law*

#### 1. Standard of review

We review de novo the district court's denial of a Rule 50(b) motion for JMOL, and we apply the same legal standard as did the district court. United Mine Workers of Am. v. Rag Am. Coal Co., 392 F.3d 1233, 1237 (10th Cir. 2004). In a diversity case such as this one, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural

question whether [JMOL] is appropriate." Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1175 (10th Cir. 2008).

A party is entitled to JMOL only if the court concludes that "all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law." Hysten v. Burlington N. Sante Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir. 2008) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). Drawing all reasonable inferences in favor of the nonmoving party, which in this case is Wagner, we thus will reverse the district court's denial of the motion for JMOL "if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Hardeman v. City of Albuquerque, 377 F.3d 1106, 1112 (10th Cir. 2004) (quotation omitted). It is not our province to "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." Hysten, 530 F.3d at 1269 (quotation omitted).

### 2. Wanton conduct under Kansas law

In Kansas, wanton conduct "is distinct from negligence and differs in kind." Bowman v. Doherty, 686 P.2d 112, 118 (Kan. 1984) (citing Kniffen v. Hercules Powder Co., 188 P.2d 980 (Kan. 1948)). Unlike negligence, "[w]anton conduct is established by the mental attitude of the wrongdoer rather than by . . . particular negligent acts." Robison v. State, 43 P.3d 821, 824 (Kan. Ct. App. 2002) (citing Friesen v. Chicago, Rock Island & Pacific R.R., 524 P.2d 1141

(Kan. 1974)). That is, "[w]anton conduct is distinguished from a mere lack of due care by the fact that the actor realized the imminence of injury to others from his acts and refrained from taking steps to prevent the injury." Bowman, 686 P.2d at 118. "This reckless disregard or complete indifference rises substantially beyond mere negligence." Id. Because "wantonness" derives from "the mental attitude of the wrongdoer[,] . . . acts of omission as well as acts of commission can be wanton." Gould v. Taco Bell, 722 P.2d 511, 518 (Kan. 1986).

To establish wanton conduct, a plaintiff must make a two-pronged showing: (1) that the act was "performed with a realization of the imminence of danger"; and (2) that the act was performed with "a reckless disregard [of] or complete indifference to the probable consequences of the act." Reeves v. Carlson, 969 P.2d 252, 256 (Kan. 1998); see also Gould, 722 P.2d at 518. Thus, "[t]he keys to a finding of wantonness are the knowledge of a dangerous condition and indifference to the consequences." Reeves, 969 P.2d at 256. The plaintiff need not prove any intent or willingness to injure. Lanning ex rel Lanning v. Anderson, 921 P.2d 813, 818 (Kan. Ct. App. 1996) (citing Boaldin v. Univ. of Kan., 747 P.2d 811, 814 (Kan. 1987)); see also Reeves, 969 P.2d at 256.

The first prong of the tort—that the act was performed with a realization of the imminence of danger—may be established in two ways. First, the plaintiff may put on direct evidence of the defendant's actual "knowledge of a dangerous condition." Lanning, 921 P.2d at 819. Second, the plaintiff may establish,

-11-

through circumstantial evidence, the defendant's "reason to believe that his act [might] injure another," because that act was taken "in disregard of a high and excessive degree of danger, either known to [the defendant] or apparent to a reasonable person" in the defendant's position.  Id. (quotations and emphasis omitted).

As to the tort's second prong, reckless disregard of or indifference to probable consequences, the Kansas Supreme Court has explained that "a token effort to prevent [harmful consequences] would not avoid liability under this [prong], while definite acts which materially lessen the chances of [those consequences] would avoid liability."  Friesen, 524 P.2d at 1148.  Critical to our analysis of such precautions is whether they materially lessen the chances of the consequences of the particular "dangerous condition" that we analyze under the tort's first prong.

In Reeves v. Carlson, for instance, the defendant injured the plaintiff when, while driving intoxicated, he ran a stop sign at an intersection and crashed through a wall of her house.  969 P.2d at 256.  The defendant argued that the plaintiff had not established that "he was fully aware of and clearly understood that he was about to collide with [the plaintiff's] home and that he was indifferent to the impending collision."  Id. (emphasis in original).  The court explained that the defendant "fail[ed] to recognize that the wanton conduct" at issue "was not the collision, but his choice to drive under circumstances that would likely or

probably result in a collision." Id.  In that case, "[t]he precautions and care" that the defendant claimed to have taken "did little, if anything, to reduce that risk." Id. (emphasis added).

In assessing whether a plaintiff has established wanton conduct, then, we must take care to apply both prongs of the tort to the same alleged risk, whether that risk be described narrowly (e.g., the risk of the specific accident that occurred) or broadly (e.g., the risk of any serious accident occurring because of the conduct at issue—e.g., the risk of any accident when the driver is intoxicated. See Reeves, supra.)  In other words, if the first part of Kansas's two-part inquiry asks whether the defendant had knowledge of a broadly described dangerous condition, the second part of that inquiry must ask whether the defendant recklessly disregarded or was indifferent to the same broadly described risk; conversely, if the first part of the test targets the narrow, specific risk that caused the particular accident at issue and asks if the defendant was aware or should have been aware of that particular specific risk, then the second part of the analysis to be consistent must ask if the defendant was indifferent to that specific risk.  In short, a plaintiff may not establish wanton conduct by satisfying the notice or knowledge element of the tort as to one risk—e.g., a broad generalized risk—and the second element of indifference of that risk to a differently defined risk—e.g., the specific risk that caused the accident at issue.

We need not decide in this case whether both the knowledge of the risk and the indifference to that risk should define risk in a generalized and broad manner or in a narrow, specific manner, and indeed courts seem to have used both approaches. Compare Robison v. State, 43 P.3d 821 (Kan. App. 2002), and Friesen v. Chicago, Rock Island & Pacific R.R., 524 P.2d 1141 (Kan. 1974), with Reeves v. Carlson, 969 P.2d 252 (Kan. 1998).

But what we can and do conclude from our review of Kansas law is that risk must be defined consistently for both elements of the tort of wantonness. As will be seen here, whether the risk is to be defined broadly (e.g., the risk of any accident in motorcycle races generally) or narrowly (e.g., the specific risk that a motorcycle might leave the track at corner #10 in this race) a JMOL should have been granted to SFX in this case so long as the risk is defined consistently for both elements of this test.

Finally, "[w]hether a defendant's conduct constitutes wantonness necessarily depends on the facts and circumstances of each case." Wolfgang, 111 F.3d at 1522 (applying Kansas law and citing Friesen, 524 P.2d at 1147).

### 3. Analysis

Wagner alleged seven grounds for wanton conduct on the part of SFX:

a.   Defendants failed to provide a safe run-off area for foreseeable crashes.

b.   Defendants left unnecessary moveable concrete walls in the foreseeable run-off area.

-14-

c.      The concrete walls that were in the foreseeable run-off area, where plaintiff hit the wall, were not padded or protected with tires, hay bales, air fences, or other safety devices.

d.      Defendants failed to properly train and equip corner workers or fire fighting personnel so that they could quickly and effectively put out the fire that resulted from plaintiff's crash.

e.      Defendants failed to staff Corners 10 and 11 with adequate numbers of corner workers, and failed to have any corner workers on the outside of Corners 10 and 11 so that they could quickly respond to an injured racer.

f.      Defendants' corner workers, fire fighting personnel, and medical personnel failed to put out the fire that engulfed plaintiff, such that the fire ceased burning on its own after running out of fuel.

g.      The communications system between corner workers and the tower was inadequate, such that the race could be timely stopped as soon as the accident occurred.

(R. vol. 4 at 1091-92 (Jury Instruction No. 14).)  We think these allegations may be construed as positing two different levels of risk, or two different "dangerous condition[s]," Reeves, 969 P.2d at 256:  the broad risk associated with staging a motorcycle race writ large; and the much narrower risk associated with the conditions on Corner 10 at Heartland Park racetrack.  We address each in turn, applying Kansas's two-pronged test for wanton conduct and recognizing, as did the district court, that the jury was "within its rights to believe little, or indeed, none of the sworn testimony" favorable to SFX.  Wagner, 522 F. Supp. 2d at 1339; see Sanderson Plumbing Prods., 530 U.S. at 151 ("[A]lthough the court

-15-

should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

### a. Risk of staging a motorcycle race

To satisfy the first part of the two-part test for wanton conduct, Wagner had to demonstrate that in staging the race in which he was injured, SFX acted, or failed to act, "with a realization of the imminence of danger." Reeves, 969 P.2d at 256. This prong of the test is easily satisfied if the risk is broadly defined as the risk of operating a motorcycle race. The jury heard testimony from Wagner's expert, Russell Darnell, that the "starting point" for all motorcycle race planning is that "crashes will happen." (R. vol. 6 at 1591-92.) Indeed, SFX could not rationally dispute this point, given that it required the racers to sign a waiver form acknowledging that "THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage." (R. vol. 1 at 142.) Wagner put on evidence sufficient to establish that SFX realized the imminence of danger in its overall staging of a motorcycle race.

To satisfy the second part of the two-part test for wanton conduct at this level of risk, Wagner was required to demonstrate that in its overall staging of the race, SFX acted with "reckless disregard [of] or complete indifference to the probable consequences of" its conduct. Reeves, 969 P.2d at 256. Here, applying the Friesen rule regarding preventative measures, we easily conclude that Wagner failed to put on evidence based upon which a reasonable jury could have found

-16-

that SFX acted wantonly rather than merely negligently. Under Friesen, "a token effort" to prevent the harmful consequences of staging a motorcycle race "would not avoid liability" for wanton conduct, but "definite acts which materially lessen the chances of" such consequences would avoid liability. Friesen, 524 P.2d at 1148.

It is undisputed that SFX engaged in a number of such definite acts to make the overall motorcycle race safer, including opening the track for practice runs on both the day before and the morning of the race to permit racers to learn the track; stationing at least one corner worker at each corner, providing those workers with a radio communication system, a fire extinguisher, and colored flags for slowing or stopping the race in case of an accident, and training the workers for roughly an hour on each of the mornings of August 7 and August 8; having two ambulances and a fire-suppression vehicle onsite during the race; placing protective air fencing in certain areas and tires along certain portions of concrete barriers outside the track; and being prepared to call for a life-flight helicopter if the need arose. We think it clear that while these preventative measures may not have been perfect, they unquestionably "materially lessen[ed] the chances," Friesen, 524 P.2d at 1148, of harmful consequences arising from SFX's staging of the race. In short, SFX took many significant steps to ensure that the race as a whole was safe.

Therefore, even if SFX acted negligently in staging the race—a claim Wagner waived when he signed the pre-race release form—it did not act with "reckless disregard [of] or complete indifference to the probable consequences of" its conduct, Reeves, 969 P.2d at 256. We thus conclude that in construing the alleged risk and dangerous condition of conducting a motorcycle race broadly, a reasonable jury could not have found SFX liable for wanton conduct. See Fed. R. Civ. P. 50(a).

            b.      Specific risk associated with the conditions on Corner 10

Wagner's case at trial, and his argument on appeal, focused most intensely on the claim that SFX behaved wantonly when it did not eliminate or protect with padding the concrete wall into which Wagner crashed, or enlarge the run-off area, outside Corner 10. To succeed on this claim based on a very specific risk that arguably contributed to Wagner's injuries, Wagner was required to show, first, that SFX acted, or failed to act, with a realization of the imminence of danger at Corner 10. Wagner could have made this showing either through direct evidence of SFX's actual "knowledge of a dangerous condition" at Corner 10, or through circumstantial evidence that SFX acted in "disregard of a high and excessive degree of danger" at Corner 10, where that danger was "known [by SFX] or apparent to a reasonable person" in SFX's position. Lanning, 921 P.2d at 819.

While the jury was free to disregard or doubt the credibility of SFX's employees and former employees who testified that they were aware of no

-18-

previous crashes at Corner 10 and that they had no reason to believe that the concrete wall in question would be an impact area, the jury was not free to infer SFX's knowledge of danger from an <u>absence</u> of evidence on the issue. Wagner offered no testimony to the effect that there had ever been a crash in the area of Corner 10, much less that the danger of such a crash was "known [by SFX] or apparent to a reasonable person" in SFX's position, <u>Lanning</u>, 921 P.2d at 819. While Randy Bodtke testified that he saw two racers go off the track at Corner 10 during the practice sessions on August 7, he clarified on cross-examination that one of the motorcycles at issue simply ran out of gas at that location and the other had a mechanical problem, so that both had to be pushed off the track. Bodtke then confirmed that he "saw no riders that had traveled all of this distance across this grassy area and got down to where there was an impact with the wall." (R. vol. 6 at 1526.) Wagner offered no evidence that SFX knew or should have known of the danger posed by the configuration of Corner 10.

Because there is no record evidence showing that SFX acted with "a realization of the imminence of danger" when it did not take additional precautions at Corner 10, we need not and do not reach the question of whether SFX acted with "a reckless disregard [of] or complete indifference to the probable consequences of" its conduct at Corner 10. <u>Reeves</u>, 969 P.2d at 256; <u>see</u> <u>Lanning</u>, 921 P.2d at 819 ("Without knowledge of a dangerous condition, indifference to the consequences does not become a consideration."). We conclude that in

construing the alleged risk and dangerous condition narrowly, a reasonable jury could not have found SFX liable for wanton conduct. See Fed. R. Civ. P. 50(a). However, we do observe that the general safety precaution that SFX took in conjunction with staging this race and which we detailed earlier would generally apply to Corner 10 as much as to other portions of the race track. Thus, even if Wagner had put on evidene that SFX knew Corner 10 was dangerous, Wagner did not show that SFX was "completely indifferent" to that danger.

c.      Conclusion as to this issue

In this case, "all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis," Hysten, 530 F.3d at 1269, for a wanton conduct claim under Kansas law. Under one theory of the case there was evidence that SFX knew of the danger but it unquestionably took many steps to mitigate or prevent injury, thereby precluding a jury conclusion that SFX cited "incomplete indifference" to the danger. Under the other theory of the case, there was no evidence that SFX knew or should have known if a specific risk presented because of the configuration or operations at Corner 10, so once again, the jury could not find wanton conduct. Consequently, SFX was entitled to JMOL, and the district court erred in denying SFX's Rule 50(b) motion.

B.      *Remaining issues on appeal*

Having held that SFX is entitled to JMOL, we need not and do not reach SFX's challenge to jury instructions and to the district court's denial of its motion for new trial.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of SFX's Rule 50(b) motion, VACATE the jury's verdict on Wagner's wanton conduct claim, and REMAND to the district court with instructions to enter judgment as a matter of law in favor of SFX. Wagner's cross-appeal is dismissed as moot, and the pending motion for certification to the Kansas Supreme Court is denied as moot.