**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BILL BARRETT CORPORATION,

      Plaintiff - Appellee,

v.

YMC ROYALTY COMPANY, LP;
YBC MANAGERS, LLC; and
BAYSHORE ROYALTY, LP,

      Defendants - Appellants.

No. 18-1067

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:15-CV-02177-DME)**

---

Jennifer Lynn Peters (Timothy Ryan Odil with her on the briefs), Otis Bedingfield & Peters, LLC, Greeley, Colorado, for Appellants.

Andrew K. Glenn (Karen L. Spaulding with him on the brief), Beatty & Wozniak, P.C., Denver, Colorado, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

---

**PER CURIAM**.

---

The Bill Barrett Corporation and YMC Royalty Company are experienced oil and gas companies with mineral rights in northeastern Colorado. In 2013, they

had the opportunity to jointly develop two oil wells.  To facilitate the drilling operations, YMC executed documents authorizing joint expenditures, accepting responsibility for costs, and electing to participate and share in the revenues.  But after depositing nearly $150,000 in revenues, YMC asserted it had never entered into an enforceable joint operating agreement with Barrett and declined to pay its share of the costs.  Barrett sued for breach of contract.  A jury ultimately found in favor of Barrett.  The district court denied YMC's motions for judgment as a matter of law and for a new trial, and this appeal followed.

We conclude the parties formed an enforceable contract under Colorado law and a reasonable jury could conclude the parties should be held to their bargain.  We also hold the district court properly exercised its gatekeeper functions for the admission of expert testimony and did not abuse its discretion in excluding YMC's expert witness.  Finally, we hold the district court's comments during the exclusion of YMC's expert witness did not improperly influence the jury.

## I.  Background

To further the development of drilling operations in Colorado's Greasewood Flats oil field, Barrett sent a proposal to YMC in January 2013.  Ijaz Rehman, controller of YMC, executed Barrett's proposal letter and the attached "Authorization for Expenditure" form (AFE) for the Greasewood 11-21H Well.

The proposal letter provided that Barrett "is hereby offering [YMC] an opportunity to participate in the [11-21 Well] . . . by paying your proportionate share of the costs." App. 3638. The letter further stated if YMC elected to participate, it must "indicate [its] approval by signing in the space provided below and as provided on the AFE." *Id.* Once participation was confirmed, Barrett would then furnish its "proposed form of Joint Operating Agreement for your review and approval." *Id.*

The space provided on the proposal letter listed three options. Mr. Rehman checked the box "I/we elect to participate in the drilling of the Greasewood 11-21H Well. Enclosed is my/our signed AFE." *Id.* at 3639. Mr. Rehman then signed the signature block, initialed the AFE on the first and last pages, and notarized the instrument. The AFE listed the total estimated cost of the 11-21 Well and YMC's proportionate share of those costs based on a proposed 12.5% working interest.

About two months later, Mr. Rehman executed a second proposal letter and AFE pertaining to the Greasewood 10-20 Well. This time, Barrett's proposal offered an 18.75% working interest in the Well. The documents contained substantially the same terms as previously, but additionally emphasized that, "[w]hile this is an estimate and actual costs may be higher or lower, execution of the AFE constitutes agreement to pay the actual costs. We understand that you

will tender your share of the costs outlined in the AFE at the time the well is commenced." *Id.* at 3654. Once again, Mr. Rehman signed the signature block, initialed the AFEs, and notarized the instrument.

In August 2013, YMC executed two division orders that listed YMC as owning 12.5% of the working interest in the 11-21 Well and 18.75% in the 10-20 Well. Internal YMC communications introduced at trial also indicated that YMC believed it owned a working interest in both wells. Most tellingly, Barrett sent monthly revenue checks and statements to YMC from September 2013 to July 2014 for YMC's ownership interests in the wells. YMC ultimately deposited $148,165.26 in revenue. In July 2014, however, the relationship deteriorated. Barrett ceased paying YMC when it learned YMC refused to pay its share of the costs and denied the existence of a contract. Barrett sued YMC for breach of contract.

The jury found YMC breached its contracts and awarded Barrett damages. Following the trial, YMC renewed its motion for judgment as a matter of law and moved for a new trial, arguing there was insufficient evidence indicating contractual formation, AFEs are unenforceable as a matter of law, and no reasonable jury could find mutual assent to contract. YMC also argued the court committed reversible error in excluding its expert witness on industry custom and practice (while allowing Barrett's expert witness) and in making unfair comments

about the expert's qualifications before he was excluded. The district court denied the motions and YMC appealed.

## II. Analysis

We first consider whether the parties formed an enforceable contract under Colorado law and whether sufficient evidence supported the jury verdict for Barrett. We then consider whether the district court erred in excluding YMC's expert witness testimony from trial.

### A. Contract Formation

As a federal court sitting in diversity, we apply Colorado contract law to this dispute. *See Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008). We "look to the rulings of the highest state court" to guide our interpretation of state law. *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007). When the highest state court has not addressed the question, we predict how it would rule after giving "proper regard to relevant rulings of other courts of the State." *Id.* (internal quotation marks omitted).

First, YMC argues that AFEs cannot be enforceable contracts as a matter of law and that the instrument contained language too indefinite to constitute a contract under Colorado law. Second, YMC says the evidence introduced at trial was insufficient to indicate mutual assent. We disagree on both points.

### 1. *Motion for Judgment as a Matter of Law*

"We review a district court's denial of a Rule 50 motion de novo, applying the same standards as the district court." *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1261 (10th Cir. 2016). "A party is entitled to [judgment as a matter of law] only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) (cleaned up). The court draws "all reasonable inferences in favor of the nonmoving party" and does not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." *Id.* (internal quotation marks omitted). Judgment as a matter of law is "cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable men could not arrive at a contrary verdict." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996) (internal quotation marks omitted).

The Colorado Supreme Court has held that "[a]lthough generally, the question of whether a contract exists is a matter of fact to be determined by the jury, this is only the case where the evidence is conflicting or admits of more than one inference." *N.Y. Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996) (internal quotation marks omitted) (citing *I.M.A., Inc. v. Rocky*

*Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986)). The "parties do not dispute what happened," but rather disagree about "what legal significance, if any, can be attached to the relevant events." *Id.* at 410. For us to rule as a matter of law, YMC must demonstrate that the evidence of contractual formation does not conflict or admit of more than one inference.

Colorado law requires parties to agree on all essential terms to form a contract. *See Fed. Lumber Co. v. Wheeler*, 643 P.2d 31, 36 (Colo. 1981). Such terms "must be sufficiently definite to enable the court to determine whether the contract has been performed or not." *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960). "[W]hen the language in a contract is too uncertain to gather from it what the parties intended, the courts cannot enforce it." *Id.* We construe the proposal letters and AFEs together "as though they comprise[] a single document." *Chambliss/Jenkins Assocs. v. Forster*, 650 P.2d 1315, 1318 (Colo. App. 1982); *see also E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 975 (Colo. 2005).

YMC argues the documents lack essential terms, such as when the obligation to pay arises, how payment is to be made, and the terms of payment, relying on *Stice v. Peterson*, 355 P.2d at 952 (identifying these terms as relevant for determining the existence of an alleged oral contract). But *Stice* does not require precise terms related to payment to prove the formation of a valid

-7-

contract. *Stice* only requires a contract to be sufficiently definite for a court to determine whether the parties performed. The contract in *Stice* was too ambiguous, since even the plaintiff "was completely uncertain as to what was actually said by the defendant." 355 P.2d at 952.

Here, by contrast, sufficient evidence exists to support a finding by a reasonable jury that the proposal letters and AFEs were sufficiently definite to constitute binding contracts under Colorado law. First, the proposal letters and AFEs contain characteristic contractual language of offer and acceptance, consideration, and terms of performance. The second proposal letter even stated that "execution of the AFE constitutes agreement to pay the actual costs." App. 3654. It also identified when the obligation to pay arises. The documents are labeled "Authorization for Expenditure" and Mr. Rehman executed them with formalities such as signature, initialing, and notarization. YMC is a sophisticated party and is expected to understand the terms contained in the proposal letters and AFEs. On their own terms, the proposal letters and AFEs were sufficiently definite for a reasonable jury to infer the existence of a contract and for a court to determine whether the parties performed their obligations.

Second, besides the actual language of the documents, the existence of a contract may also be inferred from "circumstantial evidence" of the parties' "conduct rather than in any explicit set of words." *Agritrack Inc. v. DeJohn*

*Housemoving, Inc.*, 25 P.3d 1187, 1193 (Colo. 2001).  From its course of performance, YMC understood the cost estimate and its proportionate share of the costs and benefits.  It also recorded its working interest and accepted associated revenues.  Mr. Rehman even acknowledged at trial that he knew YMC was on the hook for its share of the costs.  The parties' course of performance may admit of more than one inference, which only serves to underscore the conclusion that the existence of the contract was a fact question appropriate for the jury.

Third, a "contract will not fail for indefiniteness if missing terms can be supplied by law, presumption or custom."  *Winston Fin. Grp., Inc. v. Fults Mgmt., Inc.*, 872 P.2d 1356, 1358 (Colo. App. 1994); *see also Shull v. Sexton*, 390 P.2d 313, 316 (Colo. 1964).  Testimony in the district court established it is customary for a party to pay costs before receiving revenues; obligations may be incurred without a joint operating agreement; statements and revenues are sent monthly without a joint operating agreement; and working interest ownership determines the share of actual costs.  The evidence considered by the jury could therefore supply any missing terms related to payment and performance.

In response, YMC points to two cases.  First, it relies on dicta in *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358 (10th Cir. 1979), where we upheld a district court's finding that an AFE in that case was "an estimate of costs without binding effect in the [oil and gas] industry," *id.* at 1360.  In a subsequent case

citing *Cleverock*, the Fifth Circuit also opined that "the AFEs at bar do not, on their faces, create a legally binding obligation . . . to pay a share of the drilling, completion, and sidetrack expenses." *Sonat Expl. Co. v. Mann*, 785 F.2d 1232, 1235 (5th Cir. 1986). Relying on these cases, YMC says that AFEs cannot be contracts, as a matter of law, without a joint operating agreement.

But *Cleverock* did not question whether an AFE containing cost estimates binds the executing party to pay the costs once incurred. Rather, it addressed whether the amount was fraudulently represented on the AFE and the amount the signatory was obligated to pay. *See Cleverock*, 609 F.2d at 1360. The *Cleverock* court's statement that AFEs are "without binding effect in the industry" simply restated the district court's factual findings about industry practice; we did not announce a per se legal rule about the non-binding effect of AFEs.

Nor does *Sonat* persuasively advance YMC's argument. There, the Fifth Circuit concluded that the AFEs under consideration, standing alone, did not constitute contracts because they lacked a promise to pay costs and because the court found no jurisprudential support indicating that AFEs, without more, were binding contracts. *See Sonat*, 785 F.2d a 1234–35. Here, however, the AFEs do not stand alone—they are construed alongside the proposal letters. *See E. Ridge of Fort Collins*, 109 P.3d at 975; *Forster*, 650 P.2d at 1318. The proposal letters contain a promise to pay costs and Mr. Rehman testified he understood that

-10-

obligation. Moreover, trial testimony indicated that these AFEs—alongside the proposal letters—constituted binding contracts. Because the evidence admits of more than one inference about the existence of the contracts, it was proper for the jury to decide the question.

No doubt execution of the joint operating agreement would have added additional terms with greater specificity and detail to the contract. And the proposal letters did state that Barrett would furnish YMC with a joint operating agreement if it elected to participate. But based on the terms of the documents and the conduct of the parties, the district court did not err in denying YMC's motion for judgment as a matter of law. The execution of a joint operating agreement in this instance would have simply added additional operating terms to the existing ownership agreement between the parties, none of which were in dispute at trial.

### 2. Sufficiency of the Evidence

Next, YMC argues there is no sufficient evidentiary basis for a reasonable jury to find for Barrett on its breach of contract claim and therefore the district court erred in denying its motion for a new trial. According to Mr. Rehman's testimony at trial, it was YMC's intention to sign the cost estimates without entering into a binding agreement. It was YMC's understanding that a binding

-11-

agreement to pay costs required a signed joint operating agreement, and that the signed proposal letters and AFEs were only an agreement to negotiate further.

According to Colorado law, "[w]hether or not the parties have completed their negotiations . . . is always dependent upon the circumstances of the particular case." *Am. Min. Co. v. Himrod-Kimball Mines Co.*, 235 P.2d 804, 807 (Colo. 1951); *see also DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001) ("[T]here can be no binding contract if it appears that further negotiations are required to work out important and essential terms. Agreements to agree in the future are generally unenforceable." (citations omitted)).

We closely scrutinize correspondence between the parties to determine whether "such letters are intended merely as preliminary negotiation." *N.Y. Life Ins.*, 80 F.3d at 409 (quoting *Pierce v. Marland Oil Co.*, 278 P. 804, 806 (Colo. 1929)). "The essential question is: 'Did the parties mean to contract by their correspondence, or were they only settling the terms of an agreement into which they formally proposed to enter after all its particulars had been adjusted, and by which alone they intended to be bound?'" *Id.* (quoting *Pierce*, 278 P. at 806). "If possible, the parties' intent is to be determined from the face of the contract itself." *Id.*

Interpreting the parties' intent from the face of the documents, however, we find there is language that can be interpreted by a reasonable jury as that of offer and acceptance. *See Mestas v. Martini*, 155 P.2d 161, 167 (Colo. 1944) (Mutual assent is "arrived at by a clear and explicit acceptance of a proper and unrevoked offer."). The proposal letters offered participation, defined participation as YMC's agreement to pay its share of the costs, and prescribed the exact manner of acceptance. Although the documents referred to the future negotiation and execution of a joint operating agreement, a reasonable jury could conclude the language did not condition YMC's participation on the execution of the joint operating agreement.

Furthermore, Mr. Rehman's trial testimony indicates he understood the obligation incurred by electing to participate in the wells. *See* App. 1705–07. His testimony also demonstrates knowledge that multiple working owners may participate in a well without a joint operating agreement. *See id.* at 1692–93. YMC's actions following the execution of the documents also suggests the existence of mutual assent: YMC executed division orders confirming its working interest ownership and deposited nearly $150,000 in revenue checks from Barrett for the wells. Mr. Rehman affirmed at trial he would not have executed the division orders if they did not accurately reflect YMC's ownership interest in the

wells. Finally, evidence admitted at trial of industry custom and practice tended to show mutual assent between the parties.

The evidence was therefore sufficient for a reasonable jury to conclude the parties had entered into a binding contract and that the proposal letters and AFEs were not simply agreements to agree. The jury's conclusion was not decidedly or overwhelmingly against the weight of the evidence. *See Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) ("In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." (internal quotation marks omitted)).

Thus, the district court did not abuse its discretion in denying YMC's motion for a new trial. *See id.* (reviewing a district court's denial of a Rule 59(a) motion for abuse of discretion).

### B. Expert Testimony

YMC also appeals the exclusion of its expert witness on industry custom and practice, contending that the district court's ruling prevented it from obtaining a fair trial. First, YMC argues the court should have allowed the testimony of its expert under Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Second, YMC argues

that in excluding its expert in open court, the district court prejudiced the jury against it.

Prior to trial, YMC proffered a Denver oil and gas attorney, Randall Feuerstein, as an expert witness on custom and practice in the oil and gas industry.[1]  Barrett moved *in limine* to exclude Mr. Feuerstein's testimony, alleging it contained unhelpful legal conclusions warranting exclusion under Federal Rule of Evidence 702.  The district court granted the motion in part, but tentatively allowed Mr. Feuerstein to testify at trial on industry custom and practice.

At trial, YMC called Mr. Feuerstein to testify.  Following a lengthy *voir dire* examination of Mr. Feuerstein's credentials and proposed testimony, the district court orally ruled in front of the jury that YMC had not satisfied its burden under Rule 702 to provide relevant and reliable testimony that would be helpful to the jury.  YMC objected that the court should not have made its Rule 702 ruling in front of the jury, and moved for mistrial.  The district court denied the motion but nevertheless issued a curative instruction to clarify that the jury should not draw any inference regarding the weight of the evidence from its comments or from Mr. Feuerstein's exclusion.

---

[1]  For reasons not relevant here, Judge Jackson presided over the pretrial proceedings while Judge Ebel presided at trial.

### 1. Admission of Expert Testimony Under Rule 702

Federal Rule of Evidence 702 requires the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[2]  Under Rule 702, the court must first decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.  *See* Fed. R. Evid. 702.  Then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*."  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).  "Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's particular expertise, and the subject of the testimony.'" *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222

---

[2]  Rule 702 provides four factors relating to relevance and reliability.  It states that an expert may testify if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

(10th Cir. 2018) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148–50 (1999)).

The court, when faced with a party's objection, must "adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). "This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

Although the gatekeeper obligation is mandatory, "[i]t is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*." *Id.* A *Daubert* hearing is "not specifically mandated" and a judge may fulfill his gatekeeper obligation when asked to rule "on an objection during trial . . . so long as the court has sufficient evidence to perform the task" of ensuring reliability and relevance. *Id.* (internal quotation marks omitted).

Before trial, Barrett moved to exclude Mr. Feuerstein, claiming his testimony would constitute inadmissible legal opinions and therefore not be helpful to the jury. YMC countered that his opinions were admissible because they were based on industry custom and practice and would help the jury interpret the AFEs and allocation agreements. The district court held a pretrial hearing and

granted Barrett's motion in part, drawing a line between impermissible opinion testimony on legal matters and permissible industry custom and practice testimony:

> [The expert witness cannot] come in here and tell me and tell the jury how to decide the case, what the law is, and how it should be applied. As helpful as that might be, . . . that's not his role. That's my role, and we won't have a lawyer preaching to the jury about the law.

App. 1384. But the court "tentatively" permitted Mr. Feuerstein to "express opinions on custom and practice in the industry" to the extent such opinions were relevant. *Id.* The court then identified specific opinions in Mr. Feuerstein's expert report that would be "potentially admissible," including the industry custom and importance of joint operating agreements for allocating costs, pooling processes, and the meaning of terms in the AFEs and division orders. *Id.*

Implicitly, the court determined that any testimony drawing legal conclusions would not help the jury determine a fact in issue and therefore would not be relevant. *See* Fed. R. Evid. 702(a) (requiring that the "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *see also Pioneer Ctrs. Holding Co. ESOP & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) (testimony that makes "impermissible legal conclusions" may be excluded because it "does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"

-18-

(cleaned up)).  Despite its brevity, the district court's determination provides an adequate basis for this court to determine that it applied the correct legal test at this point in the proceedings.  *Cf. Avitia-Guillen*, 680 F.3d at 1256 (upholding a similarly concise ruling).

At trial, YMC offered Mr. Feuerstein as an expert witness on "oil and gas industry custom and practice in Colorado regarding partnering in joint operations for oil and gas development, industry custom and practice in Colorado regarding pooling and pooling declarations, and industry custom and practice regarding forced pooling."  App. 3290–91.  At that point, the court allowed Barrett to conduct *voir dire*.  After its questioning, Barrett argued YMC failed under Rule 702 to establish Mr. Feuerstein's "expertise in the oil and gas industry custom and practice as it relates to the use of joint operating agreements."  *Id.* 3301–02.  The district court then permitted YMC to further bolster the basis for Mr. Feuerstein's opinions before concluding that YMC failed to "establish[] that [Mr. Feuerstein] meets the criteria for Rule 702 to provide expert testimony," *id.* 3313.

The court made findings on both the relevance and reliability inquiries required by *Daubert* and identified the reasons for excluding Mr. Feuerstein under each of the four Rule 702 factors.  Specifically, the court doubted "this witness's testimony will be helpful to the jury in deciding the ultimate facts" because "the jury has sufficient facts and evidence to make those decisions for itself"; the court

-19-

disputed whether Mr. Feuerstein "has established unique facts or data pertaining to this case that are unique sufficient to qualify him as an expert"; the court "found nothing in [Mr. Feuerstein's] expert report that was tendered that even mentions principles or methods, no criteria and principles by which his opinion could be measured"; and the court determined Mr. Feuerstein had not "sufficiently and reliably applied those principles and methods to the fact of this case." App. 3313–15.

YMC argues the court abused its discretion in the way it resolved the challenges to YMC's expert. First, YMC says the court should have conducted a more robust pretrial hearing on reliability and relevance of the proposed testimony. But the court was not required to hold a formal *Daubert* hearing at that time. *See Goebel*, 215 F.3d at 1087 (explaining the court's discretion in its manner of fulfilling the gatekeeper function).

Second, YMC contends the district court's manner of exercising the gatekeeper function (namely, by holding an impromptu *Daubert* hearing in front of the jury) was an abuse of discretion. But a judge does not abuse his discretion by conducting a *Daubert* hearing in the presence of the jury through direct examination and *voir dire*. *See Goebel*, 215 F.3d at 1087; *see also* 29 Charles Alan Wright et al., Fed. Prac. & Proc. Evid. § 6270 (2d ed., Nov. 2018 update) (The "trial court could decide to forego a formal *Daubert* hearing outside the

presence of the jury. In lieu of such a hearing, the court could conduct a *voir dire* examination of the witness or permit the proponent of the expert testimony to establish the necessary foundation on direct examination, through affidavits, or in other ways." (footnotes omitted)). The district court's decision to hold an informal *Daubert* hearing in front of the jury was therefore not an abuse of discretion.

Finally, YMC contends the district court's trial decision to exclude all of Mr. Feuerstein's testimony was an abuse of discretion. But YMC does not explain precisely how the court abused its discretion in excluding Mr. Feuerstein except by reiterating its claim that Mr. Feuerstein is a qualified expert. No one disputes Mr. Feuerstein is a well-respected and experienced oil and gas attorney. But reasonable minds could disagree about whether his proposed testimony would have been helpful to the jury in deciding the ultimate facts. And other than reiterating its claim that Mr. Feuerstein had specialized expertise, YMC fails to rebut the other three Rule 702 bases for the district court's ruling, even though it would have to succeed on all four to prevail. Nowhere in its opening brief does YMC explain with any specificity what evidence its expert would have provided to the jury, nor does it set forth in any detail the factual basis for the proposed testimony, the methodology by which it was developed, or its application to the

facts of the case. Without these arguments, we cannot evaluate, let alone reverse, the reasoning of the district court.

Our review "will not disturb the [exclusion of an expert] unless it is arbitrary, capricious, whimsical or manifestly unreasonable, or we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Nacchio*, 555 F.3d at 1241 (internal quotation marks omitted). Given the circumstances here, the district court did not abuse its discretion.

### 2. *Improper Influence on the Jury*

Finally, YMC contends the district court improperly influenced the jury in its comments excluding Mr. Feuerstein's testimony. In particular, it objects to the court's comment that "the evidence that has already been before this jury is sufficient for the jury to be able to address these issues and [they] will not need an opinion from an outside source on those subjects." App. 3314. YMC contends this statement amounted to an endorsement of Barrett's expert witness testimony, which the jury had heard the day before and which YMC had not objected to. YMC argues the court thus usurped the fact-finding role of the jury and the only proper recourse is a mistrial.

We review de novo the district judge's comments on the evidence. *See United States v. Nickl*, 427 F.3d 1286, 1293 (10th Cir. 2005). "We review denial

of a mistrial for abuse of discretion." *N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1112 (10th Cir. 2009).

"[W]e have explained that a federal district court judge has the unquestioned right to comment reasonably upon the evidence, and to express his opinion of it, provided it is made clear to the jury that it is not bound by his views and that they are the sole judges of the facts." *United States v. Olea-Monarez*, 908 F.3d 636, 640 (10th Cir. 2018). A judge's statements must not "prevent a fair and dispassionate consideration of the evidence by the jury." *United States v. Sowards*, 339 F.2d 401, 403 (10th Cir. 1964).

After the court's ruling excluding Mr. Feuerstein's expert testimony, the court briefly recessed. Before the jury returned, YMC objected that the court should not have allowed the Rule 702 proceeding to be conducted in front of the jury. The court observed that YMC never asked it to make its Rule 702 findings outside the presence of the jury. The court therefore denied the motion for a mistrial. Nevertheless, upon the jury's return from recess, the court agreed to issue a curative instruction telling the jury not to draw any inference regarding the weight of the evidence from its exclusion of Mr. Feuerstein's testimony.[3]

---

[3] The curative instruction stated:

My ruling on the whether Mr. Feuerstein was an expert or not was addressed entirely to whether he had the unique experiences that

(continued...)

-23-

We do not think the court's comments improperly influenced the jury for two reasons. First, the court's statement occurred in the context of its evaluation of Mr. Feuerstein's qualifications to opine on oil and gas custom and practice. The court's statement should be read in that context: Mr. Feuerstein's "specialized knowledge" would not "be helpful to the jury in deciding the ultimate facts" because the court reasonably determined his testimony failed to meet all of the requirements of Rule 702. In this context, the district court's comments on the evidence were reasonable.

---

[3](...continued)
would qualify him as an expert under the four very precise criteria of Rule 702. It has nothing to do with the merits of the case. I didn't address the merits of the case. I truly don't have an opinion on the merits of the case. You have heard the evidence from two very fine lawyers, and you are going to have to decide that. My question was only whether this expert had some unique expert skills that could be brought to bear that would be helpful to you, over and above what the evidence showed, that you would need his assistance. And my ruling was exclusively and limited to the fact that this particular witness I did not think had the—met the four criteria that I must apply to determine that he had unique skills to testify in a way that would be helpful to you, over and above everything else you have heard. So I just wanted to be very clear that I am making no comment on this case and truly to assure you that I do not have an opinion on the outcome of this case. That's your prerogative, not mine. And for that reason, because I don't have to have an opinion, I truly have not formed an opinion.

App. 3324–25.

Second, the court's curative instruction clarified that it held no view about the persuasive value or impact of the evidence—its determination was limited to the qualifications of the proffered expert witness. *See Olea-Monarez*, 908 F.3d at 640 ("The district court made no comment regarding the persuasive value or impact of any evidence presented in the case. In essence, the district court told the jury to go back and look at the evidence, which it was well within its discretion to do."). "We have held curative instructions—issued promptly . . . and specifically addressing the precise impropriety complained of—can go far in erasing prejudice occasioned by an improper remark." *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1131 (10th Cir. 2009). Given the context, including the court's prompt and precise curative instruction and YMC's failure to object to Barrett's expert witness, we cannot assume the court's comments during the *Daubert* hearing improperly lent weight to Barrett's evidence at YMC's expense.

We therefore conclude that the court's comments during the *Daubert* hearing held before the jury did not prevent a fair and dispassionate consideration of the evidence. Furthermore, we find that the court's curative instruction clarified and averted any improper inference jurors might have derived from its remarks. Because it does not "clearly appear that the challenged remarks influenced the verdict," denying the motion for mistrial was not an abuse of discretion. *See Britt Paulk*, 579 F.3d at 1112.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court on all issues presented.